**PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

No. 18-2157

_____

UNITED STATES OF AMERICA

v.

EVANS SAMUEL SANTOS DIAZ,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No.: 3-16-cr-00085-006)
District Judge: Honorable Malachy E. Mannion

_____

Argued November 12, 2019

(Opinion Filed: February 25, 2020)

Before: JORDAN, SCIRICA, and RENDELL, <u>Circuit Judges</u>

Sean A. Camoni **(Argued)**
Evan J. Gotlob
Office of the United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503

                Counsel for Appellee

Jacob Schuman **(Argued)**
Brett G. Sweitzer
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

                Counsel for Appellant

O P I N I O N

**RENDELL**, <u>Circuit Judge</u>:

Appellant Evans Santos Diaz challenges his conviction for conspiracy to distribute and possess with intent to distribute heroin and cocaine, raising three distinct objections. While we are concerned that the District Court may not have been as

attentive to Diaz's complaints regarding his counsel as it should have been, and concerned as well that certain testimony by a government witness violated Rule 701, we will nonetheless deny his request for a new trial. We also conclude that the District Court did not clearly err when it attributed more than 20 grams of heroin to Diaz at sentencing. Accordingly, we will affirm.

## I.  Background

Evans Santos Diaz was charged, along with five co-defendants, with conspiracy to distribute and possess with intent to distribute drugs. One of the co-defendants, Jeffrey Guzman, orchestrated the conspiracy. He distributed to co-defendants Richard Chalmers, Louis Bracey, Landy Then, and Diaz, and periodically involved his mother, co-defendant Magdalena Alvarez, as well. All five of Diaz's co-defendants pled guilty, but Diaz chose to exercise his right to a trial.

### A.  Pretrial Complaints about Counsel

After being indicted, Diaz represented that he could not afford counsel, and a magistrate judge assigned Criminal Justice Act (CJA) counsel, Deborah Albert-Heise to represent him. A few months later, however, Ms. Albert-Heise accepted a position as an assistant district attorney and withdrew. The District Court then appointed Joseph O'Brien on July 13, 2016.

Dissatisfied with O'Brien, Diaz requested new counsel in an August letter to the Clerk of Court. Diaz stated that O'Brien pressured him to plead guilty, did not accept Diaz's advice on submitting pretrial motions, and failed to turn over discovery to him. In response to Diaz's pro se motion, the

3

District Court promptly held a hearing to inquire into the problems with the representation. At the hearing, the Court asked both O'Brien and Diaz about the issues and attempted to explain to Diaz that O'Brien was an excellent lawyer. Diaz still insisted that he wanted the Court to appoint new counsel, and the District Court appointed Joseph Kalinowski on August 29, 2016.

On December 5, 2016, Diaz wrote to the District Court to request certain documents and informed the Court that he had not received anything from counsel. In response, the Court issued an order acknowledging receipt of Diaz's letter and directing the Clerk to forward a copy of the letter to counsel for a response. The record does not reflect any response from counsel.

On February 7, 2017, Diaz again wrote to the Court to request assistance obtaining discovery and advised that he was concerned about Kalinowski's failure to communicate with him. In response to this letter, on February 14, 2017, the District Court ordered Kalinowski to file a response to Diaz by February 21. Kalinowski never complied with that order.

On February 22, following Kalinowski's failure to comply with the February 21 deadline, Diaz requested new counsel. In a pro se letter, he wrote that Kalinowski "fails to answer my letters and requests for discovery materials. . . . I am requesting that you consider appointing me new counsel." App. at 94. The Court did not then seek any additional information from Kalinowski or Diaz, nor did it inquire further or schedule any hearing to address the request to replace Kalinowski.

4

One month after the request for new counsel, on March 24, Kalinowski filed a motion for continuance in which he represented:

> The Defendant has submitted a letter to the Court which is being considered as a request for new counsel. After a meeting between counsel and the Defendant on March 23, 2017, all issues between counsel and the Defendant have been resolved and the Defendant wishes to continue with counsel's representation.

App. at 102–03. The District Court granted the continuance without commenting on Diaz's request for new counsel. Diaz and Kalinowski then appeared together on April 7 for a pretrial conference. At the conference, neither Diaz nor Kalinowski raised any issue related to the request or the representation.

Ten days after the pretrial conference, on April 17, Diaz again wrote to the District Court complaining of Kalinowski's failure to adequately represent him or to provide discovery. In the letter, he reminded the Court that Kalinowski never responded to the Court's February 14 order and again stated that Kalinowski neither responded to Diaz's letters nor visited him. On June 29, Diaz wrote to the Court complaining of Kalinowski's failure to respond, repeated motions for continuance, and failure to provide discovery. Diaz did not, however, renew his request for new counsel either before or at trial. On August 16, the case proceeded to trial with Kalinowski representing Diaz.

5

*B. Officer Gula's Testimony at Trial*

At trial, the government introduced evidence of Jeffrey Guzman's conspiracy and Diaz's role in it, including the testimony of Drug Enforcement Administration (DEA) Task Force Officer Jason Gula.  The government asked Officer Gula about the members of the conspiracy and requested that he "briefly describe in summary how each of these individuals were involved."  App. at 254.  Gula testified that Guzman was the head of the operation; that Landy Then, Richard Chalmers, and Louis Bracey bought drugs from Guzman and sold them to their own customers; and that Guzman's mother helped move and deliver the drugs.  The government then asked, "how about the Defendant, Evans Samuel Santos Diaz, how is he involved in this case?"  App. at 256.  Gula responded, "Evans Santos Diaz through the investigation we identified as being basically a subordinate of Jeffrey Guzman, working at the direction of Jeffrey Guzman, bagging up drugs for Jeffrey Guzman, distributing on behalf of Jeffrey Guzman, and also distributing to his own customers, which we learned through the investigation." *Id*.

Gula also testified about intercepted communications between Diaz and others and between others talking about Diaz.  He repeatedly testified as to the meaning and significance of those communications.  After the testimony of several other witnesses, including co-defendants Guzman and Alvarez, and the introduction of text messages and recorded phone calls, the jury convicted Diaz of conspiring to distribute

and possess with intent to distribute heroin, cocaine, and crack.[1]

### C. Sentencing

According to the presentence investigation report (PSR), Diaz's offense involved 30 grams of heroin and 1 gram of cocaine. This resulted in a base offense level of 16. U.S.S.G. § 3C1.1. Diaz objected to the drug quantity determination, arguing that the evidence only supported a finding of 15 grams. The District Court considered the arguments of Diaz and the government. Based on the text messages and intercepted communications related to Diaz introduced at trial and on the fact that all of Diaz's co-conspirators were responsible for much greater amounts, the Court concluded that 30 grams was an appropriate amount to attribute to Diaz. After adopting the PSR's conclusion that the drug quantity made the proper base offense level 16, with an enhancement for obstruction of justice bringing the adjusted offense level to 18, the District Court sentenced Diaz to 33 months imprisonment and three years of supervised release.

## II.    Discussion

Diaz raises three issues on appeal: (1) the District Court's failure to inquire into his motion for appointment of new counsel, (2) the improper admission of Officer Gula's testimony, and (3) the Court's attribution of more than 20 grams of heroin to Diaz at sentencing. We address each in turn.

---

[1] The government amended the count to reflect only heroin and cocaine.

## A. *The District Court's Failure to Inquire*

We review for abuse of discretion a district court's decision not to permit substitution of counsel. *See United States v. Goldberg*, 67 F.3d 1092, 1097 (3d Cir. 1995). Generally, "[w]hen a defendant requests a substitution of counsel . . . the district court must engage in at least some inquiry as to the reason for the defendant's dissatisfaction with his existing attorney." *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982). In the course of the inquiry, the defendant must demonstrate good cause for appointment of new counsel, "such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with his attorney." *Id.* at 188. Although the requisite inquiry may consider a variety of sources and need not include a one-on-one colloquy with the defendant, we have noted the importance of allowing the defendant, as well as counsel, the opportunity to be heard on the matter. *See United States v. Hodge*, 870 F.3d 184, 202 (3d Cir. 2017).

Under our precedent concerning district courts' obligation to inquire when a defendant lodges complaints regarding counsel's representation, the facts here present a close case. Initially, the District Court appears to have made little or no effort to probe Diaz's request that Kalinowski be replaced. Typically, if a district court fails to make "*any* on-the-record inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney," it abuses its discretion. *McMahon v. Fulcomer*, 821 F.2d 934, 944 (3d Cir. 1987); *Goldberg*, 67 F.3d at 1098; *Welty*, 674 F.2d at 190. We have not made that obligation dependent upon the number of times a defendant has made this request. We have specifically instructed that a Court must "engage in at least some inquiry,"

8

"[e]ven when the trial judge suspects that the defendant's contentions are disingenuous, and motives impure." *McMahon*, 821 F.2d at 942 (citation omitted). The District Court's inaction would thus normally raise serious questions, particularly given that Diaz complained not only about strategy but also about a total lack of communication. But this case presents a unique circumstance. Soon after Diaz made his request, the District Court had good reason to believe Kalinowski was communicating with Diaz such that Diaz's request was withdrawn or moot. On these facts—particularly given the deference owed the District Court under the abuse of discretion standard—we cannot conclude that the Court's lack of inquiry constituted an abuse of discretion.

It is clear that the Court was aware of Diaz's concerns, and it took some action to remedy the situation when it ordered Kalinowski to file a response to Diaz's December 5 letter. The District Court did not follow up on this order or insist that Kalinowski respond to Diaz's complaints, nor did it schedule a hearing to address the request, as it had when Diaz had previously sought to replace O'Brien as counsel.[2] However

---

[2] Diaz contends that, in not quickly holding a hearing as it had when Diaz sought to replace O'Brien, the District Court was enforcing an unspoken "one-substitution rule." *See* Appellant's Br. at 35. We are not persuaded that the Court had such a policy in place. It goes without saying that there is no numerical limit on the right to counsel. To say that, after having had more than one lawyer, a defendant complaining about counsel's representation must automatically represent himself would impose an arbitrary limit on the Sixth Amendment. Unless a defendant forfeits the right to counsel due to "extremely serious misconduct" or knowingly,

undesirable the Court's initial inaction may have been, within a month, the Court received information that Kalinowski was communicating with Diaz, and Diaz no longer sought new counsel. Thus, the Court's intervention was unnecessary.

The information the Court received made clear that Kalinowski was paying attention to Diaz's requests. When, on March 24, 2017, Kalinowski, in a motion for continuance, wrote that he had had a meeting with Diaz the day before and all issues between them "ha[d] been resolved and … [Diaz] wishe[d] to continue with counsel's representation," App. at 102–03, the District Court did not have any basis to question that statement. Thereafter, Diaz appeared alongside Kalinowski at a pretrial conference on April 7 and did not raise any further complaints about the representation. Although Diaz renewed his complaints about Kalinowski in April and June letters to the Court, he stopped short of asking for counsel's replacement. Further, Diaz continued to appear alongside Kalinowski throughout the trial and sentencing without complaint. Despite numerous opportunities to address the court, Diaz never again requested new counsel, nor did he ever complain of Kalinowski's effectiveness at trial. From these facts, it appears that Kalinowski and Diaz had, indeed, resolved their issues and were working together effectively. Therefore, although ideally the District Court would have inquired into Diaz's various complaints, we cannot conclude

---

voluntarily, and intelligently waives that right, his Sixth Amendment right to effective assistance of counsel persists. *See United States v. Leggett*, 162 F.3d 237, 249–50 (3d Cir. 1998) (citation omitted).

from this record that the Court's failure to do so amounted to an abuse of discretion.[3]

## B. *Officer Gula's Testimony*

Diaz next challenges the testimony of DEA Task Force Officer Gula. Because defense counsel did not object to this testimony at trial, we will reverse only for plain error. *United States v. Jackson*, 849 F.3d 540, 544 (3d Cir. 2017). Diaz contends that the District Court plainly erred by allowing, in violation of Federal Rule of Evidence 701, Gula's testimony (1) drawing the legal conclusion that Diaz was a conspirator who bagged and distributed drugs and (2) interpreting non-coded conversations in which Diaz was involved.

Federal Rule of Evidence 701 permits certain lay opinion testimony that "has the effect of describing something that the jurors could not otherwise experience for themselves" to offer the trier of fact a more "accurate reproduction of the event." *Jackson*, 849 F.3d at 553 (quoting *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016)). To achieve this purpose, Rule 701 requires that lay opinion testimony be (a) "rationally based on the witness's perception," (b) helpful,

---

[3] Our conclusion that the Court did not abuse its discretion should not be confused with an endorsement of its approach to the situation. As we have noted, the District Court did not follow up on its order that Kalinowski respond, nor did it seek an explanation from Kalinowski about his lack of responsiveness or bring Diaz and Kalinowski into court to ask about the apparent breakdown in communication. Simple steps such as these would have been appropriate and advisable.

11

and (c) "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. The proponent of the lay opinion testimony bears the burden of demonstrating an adequate foundation. *Fulton*, 837 F.3d at 291. Here, Diaz argues that Gula's testimony failed to satisfy the foundation requirements of both 701(a) and 701(b) when he testified as to Diaz's role in the conspiracy and interpreted clear conversations. We need not consider the 701(a) objections because these aspects of Gula's testimony clearly violated 701(b).

*i.     Conclusory Testimony*

We turn first to Gula's testimony about Diaz's role in the conspiracy. Diaz contends that, when Gula summarized Diaz's role, he improperly and unhelpfully offered his opinion on the ultimate issue at trial: Diaz's involvement in the conspiracy. We agree.

The District Court allowed Gula to opine that Diaz worked as "a subordinate of Jeffrey Guzman, working at the direction of Jeffrey Guzman" to bag and distribute drugs. App. at 256. This conclusory statement was obviously unhelpful, and the Court should have excluded it under 701(b). The "purpose of the foundation requirements" of Rule 701 "is to ensure that such testimony does not . . . usurp the fact-finding function of the jury." *Fulton*, 837 F.3d at 291–92 (citation omitted). Therefore, the helpfulness requirement in 701(b) requires courts to exclude "testimony where the witness is no better suited than the jury to make the judgment at issue." *Jackson*, 849 F.3d at 554 (quoting *Fulton*, 837 F.3d at 293). Here, the jury was perfectly well suited to determine, based on the evidence before them, whether Diaz worked as a part of Guzman's conspiracy. Indeed, that was the primary question

12

facing them. Gula's comments articulated precisely the conclusion the government asked the jury to infer from the evidence presented at trial, removing the jury's need to personally review the evidence. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004). Rather than offering insight the jury could not itself have gleaned from the evidence, Gula's testimony served to provide the conclusion the government wanted the jury to reach.

Such conclusory testimony undermines the goal of Rule 701 "to exclude lay opinion testimony that 'amounts to little more than choosing up sides, or that merely tells the jury what result to reach.'" *Fulton*, 837 F.3d at 291 (quoting *United States v. Stadtmauer*, 620 F.3d 238, 262 (3d Cir. 2010)). That is just what Gula did when he told the jury Diaz worked as Guzman's subordinate, bagging and distributing drugs. By admitting such testimony, the District Court allowed precisely the sort of testimony Rule 701 is designed to exclude.

### ii. Testimony about Non-Coded Statements

Diaz next challenges Gula's testimony interpreting a number of non-coded statements. We find this testimony quite problematic and have no trouble concluding that the District Court should have excluded it.

We have repeatedly held that a lay witness may not interpret clear statements understandable to a jury without violating Rule 701(b)'s helpfulness requirement. *Jackson*, 849 F.3d at 554; *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988). Certainly, lay witnesses may offer opinions about the meaning of recorded conversations if the witness's opinions are helpful in determining a relevant fact and, to an

13

"uninitiated listener," the speaker "speaks as if he were using code." *United States v. De Peri*, 778 F.2d 963, 977 (3d Cir. 1985). But even then, the trial court bears the responsibility of "vigorously polic[ing] the government's examination" to ensure the witness is "not asked to interpret relatively clear statements." *Id.* at 978; *Jackson*, 849 F.3d at 553–54.

Such policing is necessary because, when officers interpret clear, non-coded statements, they are "no better suited than the jury to make the judgment at issue," and the testimony is therefore unhelpful. *Jackson*, 849 F.3d at 554 (quoting *Fulton*, 837 F.3d at 293). In *Jackson*, we found lay testimony about a recorded call unhelpful under Rule 701(b) because the call contained "seemingly no mention of code words," although the meaning of the call was unclear. *Id*. Vagueness or lack of clarity alone does not render a conversation coded so as to permit lay opinion testimony about its meaning. If a jury could independently understand the meaning based on the conversation itself and other evidence in the case, Rule 701(b)'s helpfulness requirement bars any additional lay witness "interpretation."

Here, the District Court permitted Gula to opine, unhelpfully, about his understanding of numerous calls the jury could have interpreted for themselves, sometimes actually misinterpreting them but giving the impression that his interpretation was authoritative. Gula interpreted a call from Diaz to Guzman in which Diaz stated, "[y]o you know this bags are different sizes right?" App. at 470. Gula stated that, "based on the investigation, my training and experience, he's talking about the bags he was utilizing to bag up narcotics at the direction of Jeffrey Guzman, and he's telling Guzman that the bags are all different sizes." App. at 261. Gula also interpreted

14

a text from Louis Bracey to Diaz that read, "u got me waitin," App. at 732, to mean "Louis Bracey is waiting on Gito for a quantity of narcotics." App. at 287. These statements contained no coded terminology requiring interpretation. Gula simply repeated the language used in the conversations and then added his own conclusion that the statements referred to narcotics activity. We criticized this type of testimony in *Jackson*, where we noted that the translation of "you can go ahead and send him" to mean "it is okay now to send [a co-conspirator] to purchase cocaine in Dallas" presented a particularly egregious violation of 701(b). 849 F.3d at 554. Gula repeatedly offered such egregious testimony, advising the jury that clear statements described narcotics activity.

The government contends that many of the communications did include code words. For instance, the government points to conversations using the term "barbershop," which it argues served as a code word for a meeting place for drug purchases. But "barbershop" was not a code word. It referred to an actual barbershop—albeit one where the evidence showed that the co-conspirators also distributed drugs. Nonetheless, Gula purported to "interpret" a text message from Diaz, in which he said, "[c]ome on the guy is at the barbershop waiting for me." App. at 472. Gula commented, "[t]his is significant, because during the course of investigation, we identified the location of Ramirez Barbershop, which is approximately one block away from Jeffrey Guzman's residence. Jeffrey Guzman and Evans Santos were regularly going over to the barbershop to distribute narcotics to customers." App. at 262. None of this testimony offers an interpretation of a coded statement.

15

This commentary about Diaz's reference to the barbershop did not amount to proper lay opinion testimony. Although evidence of drug activity at Ramirez Barbershop was certainly relevant evidence to put before the jury, it was not necessary to understand the meaning of Diaz's text message. Rather, linking Diaz's statement to the evidence about Ramirez Barbershop, as Gula did in his testimony, constituted *argument* about the *significance* of Diaz's statement. Although it is "perfectly appropriate for the prosecutor to argue in summation" that relevant evidence supports a particular inference from communications, a "case agent's testimony may not 'simply dress[ ] up argument as evidence.'" *Jackson*, 849 F.3d at 554 (alteration in original) (quoting *Fulton*, 837 F.3d at 293). The government would have been well within its rights to argue in summation that, based on the other evidence about Ramirez Barbershop, the use of "barbershop" in the co-conspirators' communications referred to drug transactions at Ramirez Barbershop. But to present that argument by way of lay opinion testimony interpreting a coded statement violated Rule 701(b).

Accordingly, we conclude that the trial court improperly admitted Gula's conclusory testimony about Diaz's role in the conspiracy as well as the testimony about his impressions of the communications in violation of Rule 701(b).

### iii. Plain Error

Nonetheless, the plain error standard of review prevents reversal. Under that standard, the error must be "clear under current law" and impact substantial rights, having prejudiced the defendant by affecting the trial's outcome. *United States v. Olano*, 507 U.S. 725, 734 (1993). Moreover, we will not

16

reverse unless the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732 (alteration in original) (internal quotation marks and citation omitted).

The improper testimony did not prejudice Diaz so as to affect his substantial rights. Aside from Gula's testimony, the prosecution introduced considerable evidence of Diaz's involvement in the conspiracy, including the testimony of two co-defendants, the testimony of additional investigators, and numerous calls and text messages. Further, with respect to Gula's testimony about the communications, Kalinowski effectively demonstrated on cross-examination that Gula had relied on experience unrelated to the investigation and that his testimony reflected only his impression of the conversations. These factors significantly "mitigate[ ] the likelihood that [the improper] testimony affected the outcome of the proceedings." *Fulton*, 837 F.3d at 295.

The error also did not impact the fairness, integrity, or public reputation of the proceedings because the prosecutor did not rely on any of Gula's improper testimony in summation. When "urging a guilty verdict, the prosecution focused the jury's attention only on the extensive admissible evidence supporting that result." *Id.* (quoting *Garcia*, 413 F.3d at 217). Accordingly, we cannot conclude that the error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.*

17

## C. The District Court's Attribution of More than 20 Grams of Heroin

Diaz last challenges the District Court's attribution of 30 grams of heroin to him at sentencing, which caused the Court to increase the base offense level from 14 to 16. The base offense level of 16 applies when a defendant is responsible for at least 20 grams but less than 40 grams of heroin. U.S.S.G. § 2D1.1(c)(12). Therefore, as long as the evidence demonstrated Diaz's responsibility for the minimum 20 grams of heroin required for base offense level 16, any error in the Court's determination that he was responsible for 30 grams did not affect the base offense level or the resulting Guidelines range.

A sentencing court must determine by a preponderance of the evidence that a defendant was responsible for a particular weight of a substance before attributing that amount to the defendant. *United States v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992). District courts may not calculate quantity based on "mere speculation." *Id.* However, we permit "some degree of estimation" in drug conspiracy cases because "the government usually cannot seize and measure all the drugs that flow through a large drug distribution conspiracy." *Id.*; *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993).

If a district court makes an error in its drug quantity determination that does not affect the base offense level or Guidelines range, the error is harmless. *United States v. Woodside*, 895 F.3d 894, 901 (6th Cir. 2018) (finding any error harmless where, absent alleged error, defendant "would still have been sentenced according to the same base-offense level under any conceivable estimate"); *United States v. Alaniz*, 726

18

F.3d 586, 621 (5th Cir. 2013) (finding any error harmless where, absent alleged error, the undisputed drug quantity was "sufficient to surpass the . . . threshold for the maximum Base Offense Level"); *see also United States v. Sykes*, 854 F.3d 457, 462 (8th Cir. 2017) (noting that, where a change in base offense level would not alter the applicable Guidelines range, any error in drug quantity calculation would be harmless). Any error in attributing 30 grams of heroin to Diaz would therefore be harmless, so long as the evidence supported a finding of at least 20 grams.

We review the District Court's factual determination that Diaz was responsible for at least 20 grams of heroin for clear error. *See United States v. Metro*, 882 F.3d 431, 437 (3d Cir. 2018). When a district court improperly bases a sentence on clearly erroneous facts, such a procedural error requires reversal. *Gall v. United States*, 552 U.S. 38, 51 (2007). We find a sentencing court's factual findings clearly erroneous if they are "unsupported by substantial evidence, lack adequate evidentiary support in the record, are against the clear weight of the evidence or where the district court has misapprehended the weight of the evidence." *United States v. Johnson*, 302 F.3d 139, 153 (3d Cir. 2002). Diaz argues that the Court clearly erred in concluding that Diaz was responsible for 20 or more grams of heroin. We disagree.

The Court had ample basis for determining that Diaz was responsible for at least 20 grams of heroin. Guzman testified that Diaz "used to bag up" heroin for him. App. at 327. When asked how much he would "normally pay" Diaz, Guzman responded that he "paid him a hundred dollars each 10 bricks he did. So a brick is 50 bags. So each 50 times 10, 500." *Id.* This testimony indicates that payment of $100 in

19

exchange for bagging 500 bags of heroin—approximately 15 grams—constituted a normal transaction for Diaz's services. The parties agree that at least one such transaction occurred. Guzman testified that a text message in which Diaz said he needed "a hundred" meant that Diaz wanted to "bag up" in exchange for $100 and remarked, "that is what I paid him for the drugs he bagged up." App. at 334–35. Based on this evidence, Diaz undisputedly bears responsibility for bagging at least 500 bags, or 15 grams, of heroin.

But Diaz bagged for Guzman more than once. Alvarez testified that she twice saw Diaz bagging for Guzman, and Guzman testified that he gave Diaz heroin twice. Although only the text message noted above specifically referenced $100, demonstrating a quantity of 500 bags, the evidence indicated that Guzman "normally" paid Diaz $100 for every 500 bags, allowing the inference that a similar exchange of $100 for 500 bags would have occurred on the second occasion. App. at 327. Two like exchanges would have resulted in a total of 30 grams from Diaz bagging 1,000 bags of heroin. If, instead, Diaz bagged only half the amount of heroin—250 bags—the second time, that would still have added 7.5 grams, bringing the total to 22.5 grams. Even assuming Diaz bagged less than half the normal amount of heroin on the second occasion, however, additional evidence supported the conclusion that Diaz bore responsibility for more than 20 grams of heroin.

Numerous text messages and calls showed that, beyond the two occasions noted above, Diaz repeatedly worked for or sought work from Guzman. Guzman testified that Diaz sought to bag or distribute heroin at "the barbershop"—where the evidence established members of the conspiracy frequently

20

distributed heroin—in at least one text message and one subsequent call discussed at trial.  App. at 333–34, 471–74.  In a third communication to Guzman, Diaz texted about the size of bags, and Guzman testified that the message concerned the bags Diaz used while bagging for Guzman.  At least five other text messages further supported the inference that, on the dates of those messages, Diaz was completing work or seeking work in furtherance of the conspiracy.  Even if each of these incidents involved only one brick—one-tenth of the amount of work for which Diaz was "normally" paid—the total for which Diaz was responsible would exceed 20 grams of heroin.  The District Court did not clearly err in attributing at least 20 grams of heroin to Diaz, and to the extent any error occurred in attributing 30 grams specifically, such error was harmless.

## III.    Conclusion

With respect to each of Diaz's challenges, we find no error warranting reversal.  First, we cannot conclude that the District Court abused its discretion when it did not address Diaz's motion for appointment of new counsel.  Next, although the District Court erred by failing to exclude testimony that violated Rule 701, the error was not plain so as to warrant reversal.  Finally, we conclude that the Court did not clearly err in attributing at least 20 grams of heroin to Diaz, and any error in attributing 30 grams, rather than 20, was harmless.

For the foregoing reasons, we will affirm.

21