**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1516
_____

UNITED STATES OF AMERICA

v.

PATRICK TITUS,
                Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:18-cr-00045-001)
District Judge: Honorable Richard G. Andrews
_____

Argued: June 20, 2023

Before: CHAGARES, *Chief Judge*, and BIBAS and MATEY,
*Circuit Judges*

(Filed: August 22, 2023)
_____

Mary Kate Healy        **[ARGUED]**
Eleni Kousoulis
OFFICE OF THE FEDERAL PUBLIC DEFENDER
800 King Street, Suite 200

Wilmington, DE 19801
    *Counsel for Appellant*

John-Alex Romano          **[ARGUED]**
Jeremy R. Sanders
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
Room 7101
1400 New York Avenue NW
Washington, DC 20005
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

Though the prosecution bears a heavy burden of proof, we will not let it cut corners. Dr. Patrick Titus wrote thousands of prescriptions for controlled substances. The government properly proved that many of these prescriptions were unlawful, so we will affirm Titus's conviction. But many other prescriptions were lawful. And the severity of Titus's sentence depended on how many were not. Rather than review every patient's file, the government urged the court to extrapolate from a small sample. Yet the government failed to show that doing so would satisfy its burden to prove the drug quantity by a preponderance of the evidence. Because the court sentenced Titus without enough proof, we will vacate his sentence and remand for resentencing.

## I. THE PILL MILL

Titus ran a solo medical practice and had a license to prescribe controlled substances. For a time, business boomed. In its last thirteen months, Titus's practice earned almost $1.1 million by handing out more than 20,000 prescriptions for Schedule II drugs.

But many of those prescriptions were illegal. For one thing, Titus would often do only cursory physical examinations before prescribing opioids. As a former patient put it, visiting Titus was like a "revolving door, in and out." JA 560. For another, he kept prescribing drugs despite signs that his patients were diverting or abusing them. Many tested negative for prescribed drugs or tested positive for illegal drugs. Though Titus sometimes sent these patients warning letters, he kept the prescriptions flowing. And even when he kicked patients out of his practice, he often sent them off with one last prescription.

Eventually, others caught on. Several drugstores refused to fill his prescriptions. And at least two of Titus's patients overdosed, leading other doctors to file professional complaints against him. Trying to avoid the growing scrutiny, he shut down his practice.

But it was too late. Just weeks later, federal agents raided the homes of Titus and two of his employees. There, they found thousands of patient files, revealing Titus's illicit practices. He was indicted on fourteen counts of unlawfully dispensing and distributing controlled substances (one count for each of fourteen prescriptions) and one count of maintaining drug-involved premises, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C),

3

856(a)(1). The jury acquitted Titus on one dispensing-and-distributing count but convicted him on all the rest.

Yet the fourteen prescriptions in the indictment were far from the whole story. At trial, with an eye toward sentencing, the government put on evidence of many prescriptions beyond the fourteen listed in the indictment. That evidence came from two witnesses: the government's statistician and its medical expert.

The statistician began by reviewing data from the Prescription Monitoring Program. The Program records when doctors write prescriptions, when drugstores fill them, and which patient gets them. From that data, he identified 1,142 patients who had gotten a prescription for controlled drugs from Titus during his practice's last two years. From that group, the statistician drew a random sample of 300 patients. That sample was appropriate, he testified, because it was large enough for reliable extrapolation.

Of the 300 patients, the government found only 282 patients' files. The statistician reviewed those files and extrapolated from them to the total universe of patients, concluding that Titus had handed out (a) 29,323 prescriptions for controlled substances to 948 patients with at least one inconsistent drug test and (b) 1,552 prescriptions for controlled drugs to 352 patients he had already discharged from his practice. Though these numbers reflected suspicious prescriptions, the statistician said nothing about how many were illegal.

But the government's medical expert did. From the 282-patient sample, the government asked him to review the first

twenty-four files. He determined that Titus had written illegal prescriptions to eighteen of the twenty-four patients.

At sentencing, the government sought to hold Titus responsible not just for the thirteen illegal prescriptions for which he was indicted and convicted, but for all his relevant conduct. U.S.S.G. §1B1.3(a)(1). Under the Sentencing Guidelines, his responsibility was based on the total "converted drug weight" of all his illegal prescriptions. §2D1.1.

Predictably, Titus and the government put forward vastly different weights. The government tried to include all the Schedule II prescriptions Titus had written in his practice's last thirteen months. By that count, his converted drug weight was more than 106,000 kilos, giving him a base offense level of 38. Titus said the court should look at only the thirteen patients for whom he had been convicted, plus the eighteen whom the medical expert had identified. Those thirty-one patients had a converted drug weight of only 7,500 kilos, which would mean a base offense level of 32.

The District Court steered a middle path. On the one hand, it hesitated to include all the drugs from all thirteen months, whether lawfully or unlawfully prescribed. On the other hand, it declined to limit the sentence to the drugs personally reviewed by the jury and medical expert. So the court revised the government's calculation, holding Titus responsible for at least 30,000 kilos.

To reach that weight, the court cited "general trial evidence" and the backdrop of "widespread illegal prescribing [and] ignoring of positive drug tests." JA 2335–36. But it relied mostly on the medical expert's testimony. The court believed

5

that it could extrapolate from the sample of twenty-four files "careful[ly]," even though it thought that this was "not a statistically valid number." JA 2336. The court's finding of at least 30,000 kilos led to a base offense level of 36. After adding two other enhancements, Titus's Guidelines range was 292 to 365 months' imprisonment. Varying downward, the court sentenced Titus to 240 months. He now appeals.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction to review Titus's sentence under 18 U.S.C. § 3742(a) and his conviction under 28 U.S.C. § 1291.

## II. THE GOVERNMENT FAILED TO PROVE TITUS'S DRUG WEIGHT

Titus says there was not enough evidence to prove that he was responsible for at least 30,000 kilos. We review the District Court's factual finding for clear error. *United States v. Diaz*, 951 F.3d 148, 159 (3d Cir. 2020). And "[a]t sentencing, the government bears the burden of proving drug quantity by a preponderance of the evidence." *United States v. Douglas*, 885 F.3d 145, 150 (3d Cir. 2018) (internal quotation marks omitted and alterations adopted).

As mentioned, some of Titus's prescriptions were lawful. *See* 21 U.S.C. § 841(a); *Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022). So the drug quantity for which he may be criminally punished is the amount of *illegal* prescriptions. Extrapolation is permissible, but "the government must show, and the court must find, that there is an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." *United States v. McCutchen*, 992 F.2d 22, 25–26 (3d Cir. 1993). To meet this

6

standard, "the government would be well advised to introduce more detailed (and less conclusory) evidence" to support its "conclus[ion] that there was a representative sample." *Id.* at 26 n.8.

Yet the evidence did not support a reliable extrapolation. The District Court used the medical expert's review of twenty-four files to infer the illegality of thousands of other prescriptions. In the court's view, that sample size was not "statistically valid." JA 2336. Yet it extrapolated anyway. And without much explanation from the District Court, Titus had no chance to "respond meaningfully, or for that matter, at all." *United States v. Nappi*, 243 F.3d 758, 766 (3d Cir. 2001).

Plus, the government never showed that the sample was large enough to be reliably representative of the remaining thousands of prescriptions. (Though statistical evidence can help to show that a sample size is large enough to support reliable inferences, we do not hold that such evidence is always necessary.) Nor did it document proper extrapolation methods. And it never explained how extrapolating from this sample could prove the huge drug weight by a preponderance of the evidence. So the sentencing court failed to "ensure that the Government carrie[d] [its] burden [of proof] by presenting reliable and specific evidence." *United States v. Roman*, 121 F.3d 136, 141 (3d Cir. 1997) (internal quotation marks omitted).

If not as a reliable extrapolation, the government asks us to affirm the court's finding as a reasonable estimate. The two terms emphasize different things here: extrapolation is using a representative sample to draw inferences about a *known*, larger whole, while estimation is using evidence of particular drug

7

conduct to infer the *unknown* total drug quantity associated with that conduct. Neither extrapolation nor estimation is a legal term of art. Rather, both are complementary ways for the government to satisfy its burden of proof: that, more likely than not, the defendant possessed, sold, or distributed at least this drug quantity.

Some cases may call for both estimation and extrapolation, but this case does not. We have allowed estimation as a way to compute an overall drug quantity that is unknown. *See, e.g.*, *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993); *Diaz*, 951 F.3d at 154, 159–60. Here, by contrast, the universe of drugs is known. Thus, estimation was not needed. *Paulino*, 996 F.2d at 1545.

As a last-ditch measure, the government cites other evidence, but none of it suffices. The statistician noted suspicious prescriptions but declined to call them unlawful. And the other trial evidence was too general. Plus, the drug-involved-premises conviction does "not translate readily into a specific drug quantity finding, which is the ultimate issue for sentencing purposes." *United States v. Miele*, 989 F.2d 659, 668 (3d Cir. 1993).

On remand, the government can try to put on more drug-quantity evidence. But it may not do so unless admitting the evidence is necessary for fairness. *United States v. Rowe*, 919 F.3d 752, 762–63 (3d Cir. 2019); *United States v. Dickler*, 64 F.3d 818, 832 (3d Cir. 1995). We leave that decision to the District Court.

**III. Titus's Challenges to His Conviction Fail**

Though Titus's challenge to his sentence has merit, his many challenges to his conviction do not. *First*, he says the District Court should have admitted his expert testimony that his thinking was "rigid and inflexible." Appellant's Br. 28. And he says excluding that testimony violated his constitutional right to present a defense. We review the evidentiary decision for abuse of discretion and the constitutional argument de novo. *United States v. Watson*, 260 F.3d 301, 306 (3d Cir. 2001); *United States v. Gordon*, 290 F.3d 539, 546 (3d Cir. 2002).

The court rightly excluded the testimony because it did not "support a legally acceptable theory of lack of mens rea." *United States v. Pohlot*, 827 F.2d 889, 906 (3d Cir. 1987). And it properly excluded a variant of the testimony that would have "state[d] an opinion about whether [Titus] … ha[d] a mental state … that constitutes an element of [§ 841(a)(1)]." Fed. R. Evid. 704(b). Because the District Court reasonably applied "the standard rules of evidence," excluding the testimony did "not violate [Titus's] constitutional right." *United States v. Heinrich*, 57 F.4th 154, 167 (3d Cir. 2023) (internal quotation marks omitted).

*Second*, Titus argues that the District Court wrongly closed the courtroom during jury selection. Because he did not object at trial, he bears the burden of showing "a plain error that affect[ed] [his] substantial rights." Fed. R. Crim. P. 52(b). But his only evidence of a courtroom closure is an ambiguous order to relocate. So he has not carried his burden to show that the District Court erred. *Puckett v. United States*, 556 U.S. 129,

135 (2009); *United States v. Olano*, 507 U.S. 725, 734 (1993). And even if he had, justice would not require reversal. *United States v. Williams*, 974 F.3d 320, 337, 347–48 (3d Cir. 2020).

*Third*, Titus challenges the jury instructions and the court's rejection of his proposed good-faith instruction. We review the instructions' statement of the law de novo and the court's refusal to give a specific instruction for abuse of discretion. *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011). Here, the instructions required the jury to find that Titus had knowingly or intentionally distributed controlled substances outside "the usual course of professional practice and not for a legitimate medical purpose." JA 2168. That instruction correctly reflected *Ruan*. 142 S. Ct. at 2375. Because its instruction covered the relevant law, the District Court did not abuse its discretion by denying the proposed good-faith instruction. *United States v. Gross*, 961 F.2d 1097, 1102–03 (3d Cir. 1992).

*Finally*, Titus argues that a series of prosecutorial misdeeds violated due process. We review the court's rulings on alleged prosecutorial misconduct for abuse of discretion. *United States v. Lee*, 612 F.3d 170, 193 (3d Cir. 2010). Whether taken individually or together, we see no misconduct here.

Titus says the government improperly (1) elicited a prejudicial statement from one of its witnesses and (2) commented on his silence. But the District Court found that the government had not elicited the statement deliberately. And in context, the prosecution did not "manifestly intend[ ]" to comment on his silence, nor would the jury "naturally and necessarily" have taken it that way. *United States v. Brennan*, 326 F.3d 176, 187–88 (3d Cir. 2003) (internal quotation marks omitted). Plus, the

10

District Court struck the comments and gave curative instructions, which we presume the jury followed. *See Samia v. United States*, 143 S. Ct. 2004, 2013–14 (2023).

Titus also challenges the government's opening statement and closing argument. But he failed to object at trial and cannot show "egregious error or a manifest miscarriage of justice." *Brennan*, 326 F.3d at 182 (internal quotation marks omitted). And the challenged statements fell within the prosecutor's "considerable latitude" to argue the evidence. *United States v. Green*, 25 F.3d 206, 210 (3d Cir. 1994) (internal quotation marks omitted).

Titus lastly protests that the prosecution waited to disclose a failed undercover investigation until the eve of trial. This is a *Brady* claim, for which we review the court's legal conclusions de novo and its findings of fact for clear error. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir. 2013). Titus's argument is belied by the record: he used the investigation effectively throughout his defense, so it was disclosed in time. *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).

\* \* \* \* \*

The government may not use a small sample size to justify a much larger criminal punishment without explaining how that evidence satisfies its burden of proof. And courts must tread cautiously too. At a minimum, any extrapolation must be shown to be reliable, and defendants must have a fair chance to challenge its reliability. Because Titus's sentencing fell short, we will vacate his sentence and remand.