**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1287
_____


UNITED STATES OF AMERICA

v.

CHARLES J. SENKE,
                              Appellant

_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No.: 3:16-cr-00373-001)
District Judge: Hon. James M. Munley

_____


Argued July 8, 2020

(Opinion Filed: January 25, 2021)

Before:  McKEE, BIBAS, and FUENTES, *Circuit Judges*.

Robert Epstein        [Argued]
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
                *Counsel for Appellant*

Michelle L. Olshefski [Argued]
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503
                *Counsel for Appellee*

---

OPINION

---

FUENTES, *Circuit Judge*.

Appellant Charles Senke challenges his conviction for attempted sex offenses involving a minor, raising four objections. First, he contends that it was error for the District Court not to inquire into his motions regarding counsel's performance. Second, he asserts that the District Court erred when it failed to verify at sentencing that he discussed the presentence report with counsel. Third, he takes issue with several special conditions of supervised release. Finally, he argues that a special assessment fee was erroneously imposed pursuant to a statute enacted after his offense conduct.

2

While the District Court's failure to address Senke's complaints regarding his counsel was an abuse of discretion under our precedent in *United States v. Diaz*,[1] we decline to review this error for prejudice on direct appeal in the first instance. We also conclude that Senke was not prejudiced by the District Court's failure to verify on the record that Senke and his attorney discussed the presentence report before imposing sentence. Finally, because the special conditions of supervised release banning Senke's computer and internet use run afoul of our precedent in *United States v. Holena*,[2] and because the Government concedes that the imposition of these conditions and a special assessment fee was plain error, we will remand for further proceedings on these issues. Accordingly, we will affirm in part and vacate and remand for further proceedings in part.

## I.    BACKGROUND

### A.    Offense Conduct

Appellant Charles Senke was arrested after striking up an online conversation on a popular social networking site with an undercover detective posing as an underage boy. In the course of that correspondence, Senke requested naked photographs of the underage boy, asked about the boy's sexual experiences, transmitted graphic photographs of himself and others, and offered to buy the boy gifts. During these exchanges, Senke was reminded multiple times that he was purportedly conversing with a minor.

---

[1] 951 F.3d 148 (3d Cir. 2020).
[2] 906 F.3d 288 (3d Cir. 2018).

The pair eventually made plans to meet. Senke agreed to travel to a mall near where he believed the boy lived. On the day of the planned meeting, Senke's vehicle was spotted by undercover detectives and followed into the mall parking lot. As Senke pulled into a parking spot, the detectives stopped the vehicle and took Senke into custody. Detectives found a cell phone, condoms, personal lubricant, a laptop computer, a memory card and other personal items in Senke's car.

### B.    Procedural History

Senke was charged in a three-count Superseding Indictment by a federal grand jury in Scranton, Pennsylvania for his attempts to engage in illicit sexual conduct with a minor.[3]

He appeared before the District Court and pleaded not guilty. He was then appointed a federal public defender to represent him. Less than two months later, the federal public defender filed a motion to withdraw as counsel, citing irreconcilable differences regarding case strategy. The District Court held a hearing on the matter, at which time Senke indicated that he wished to proceed pro se. After interviewing Senke, the District Court permitted him to proceed pro se, with the public defender as standby counsel.

Acting in a pro se capacity thereafter, Senke filed a plethora of pretrial motions, challenging the charges, the evidence, and his detention. The motions were denied.

---

[3] Senke was charged with violating 18 U.S.C. §§ 2423(b), 2422(b), 1470.

4

Following a conversation at a subsequent detention hearing, the District Court indicated that Senke agreed to accept appointed counsel. The District Court appointed a Criminal Justice Act attorney, Matthew T. Comerford, to represent Senke going forward.

### i. Pretrial Complaints about Comerford

In April 2018, Senke filed a pro se motion titled, "Pro Se Omnibus Pre-Trial Motion" and "Inadequate Representation."[4] In that motion, Senke asserted that Comerford, *inter alia*, (i) tried to pressure him to take a plea deal, (ii) did not take or return phone calls, (iii) refused to go over evidence, calling it "to[o] disgusting," (iv) failed to turn over discovery to Senke, and (v) was not preparing a defense strategy for trial.[5] Senke also asserted that with Comerford as counsel, he "cannot get a fair and just trial."[6] Senke did not, however, specifically request the appointment of new counsel.

The District Court took no action on this motion. Instead, Comerford filed a motion in July 2018, requesting that co-counsel be added to Senke's defense team. The District Court granted the motion, appointing Comerford's associate, Curt M. Parkins, to assist at trial.

A pretrial conference was held in August 2018. The conference was attended by Comerford and Parkins, and the prosecutor, but not Senke. At the conference, Comerford indicated that Senke was giving him "a hard time" about filing

---

[4] App. 315-17.
[5] App. 316.
[6] App. 317.

additional pretrial motions.[7]  Comerford stated, "I'm just letting you know he's not happy with me that I am not filing more motions."[8]  The District Court responded, "[h]e doesn't have much of a chance of losing you, right.  You're the second or third guy on this deal."[9]

In apparent reference to Senke's pretrial letter regarding counsel, Comerford stated, "[Senke is] putting in writing that I am not doing things."[10]  This conversation prompted the prosecutor to ask, "He's not trying to fire you, is he?"[11]  Comerford responded, "[n]ot that I know of," and Parkins stated, "[j]ust difficult."[12]  The hearing concluded without any further mention of Senke's letter.

In the months leading up to trial, Senke did not submit any additional requests or communications to the District Court regarding his defense team.  Trial commenced on October 2, 2018 with Comerford and Parkins representing Senke.  Defense counsel did not present any evidence, and relied solely on a defense of entrapment.  The next day, the jury returned a guilty verdict on all counts.

ii.    *Post-trial Complaints about Comerford*

While awaiting sentencing, Senke filed three pro se motions regarding counsel.  The first motion, requested that

---

[7] App. 337.
[8] App. 338.
[9] Id.
[10] App. 338-39.
[11] App. 339 (alterations in original).
[12] Id.

6

Comerford be substituted for "an appealant [sic] attorney."[13] The second motion, informed the District Court that Senke sent a complaint to the Disciplinary Board and requested "substitution of counsel in regard to the above-mentioned matters."[14] The third motion, requested "a CJA Appealant [sic] appointment by the Court."[15]

The District Court denied the first and third motions in written orders. In denying the first motion, the District Court footnoted its understanding of Senke's request for an "appealant [sic]" attorney as follows:

> The deadline for defendant filing an appeal runs from the entry of judgment. Fed. R. App. P. 4(b)(1) ("In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of … the entry of either the judgment or order being appealed; or … the filing of the government's appeal.") The judgment will be entered after defendant is sentenced. Upon appeal, the Third Circuit Court of Appeals has authority to appoint counsel for the defendant.[16]

In denying the third motion, the District Court stated that Senke's "pro se motion to substitute counsel for appellate reasons" was denied because "[t]he appeals court will deal with

---

[13] App. 637.
[14] App. 638.
[15] App. 642.
[16] App. 641.

appointing defendant counsel for appeal purposes."[17]   The District Court did not separately respond to the second motion.

### iii.   *Sentencing*

After the jury verdict, the District Court ordered a presentence investigation report (the "PSR") to be filed.  Senke submitted his own objections to the draft PSR, and Comerford filed a sentencing memorandum on Senke's behalf.  The final PSR was filed, and an addendum was concurrently filed addressing Senke's objections.  As relevant on appeal, the District Court did not confirm at sentencing that Senke and Comerford had an opportunity to discuss the PSR together.

Sentencing was held on January 29, 2019.  The final PSR provided a Guidelines imprisonment range of 168 to 210 months.  Prior to imposing the sentence, the District Court sustained an objection with respect to a five-level enhancement under U.S.S.G. § 4B1.5(b)(1) for repeat prohibited sexual conduct, and adjusted Senke's total offense level from 35 to 30.  Because Count II carried a statutory mandatory minimum sentence of ten years' imprisonment, the adjusted Guidelines range was 120 to 121 months.  The District Court sentenced Senke to the mandatory minimum term and ten years of supervised release.   Additionally, it imposed 17 special conditions of supervised release, including:

> 1. You must submit to substance abuse testing to determine if you have used a prohibited substance;

---

[17] App. 650.

8

6. You must not have direct contact with any child you know or reasonably should know to be under the age of 18, including your own children, without the permission of the probation officer;

7. You must not go to, or remain at, any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds, and childcare facilities;

8. You must not go to, or remain at, a place for the primary purpose of observing or contacting children under the age of [18];

10. You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are in compliance with the requirements of your supervision or treatment program;

11. You must not possess and/or use computers . . . or other electronic communications or data storage devices or media;

12. You must not access the Internet except for reasons approved in advance by the probation officer;

13. You must allow the probation officer to install computer monitoring software on any computer . . . you use;

14. To ensure compliance with the computer monitoring condition, you must allow the

probation officer to conduct initial and periodic unannounced searches of any computers . . . subject to computer monitoring;

15. You must submit your person, property, house, residence, vehicle, papers, computers . . . other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer.[18]

Senke was also ordered to pay a special assessment fee of $10,000 under the Justice for Victims of Trafficking Act of 2015 (the "JVTA").[19]  This appeal followed.

## II.   JURISDICTION

The District Court had subject matter jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231.  We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).  The District Court entered its judgment on January 30, 2019, and a timely notice of appeal was filed on February 1, 2019.

---

[18] App. 13-14, 665-67.
[19] 18 U.S.C. § 3014

## III. DISCUSSION

Senke raises four issues on appeal: (1) the District Court's failure to inquire into his motions regarding counsel; (2) the District Court's failure to verify that he and his attorney discussed the PSR before sentencing; (3) the imposition of contradictory, vague, excessively delegative, or overbroad conditions of supervised release; and (4) the imposition of a special assessment fee pursuant to a statute enacted after the offense conduct. We address each in turn.

### A. The Failure to Inquire

Senke's primary argument is that the District Court erred in not inquiring into his motions regarding counsel. We review a district court's decision on a motion for appointment of counsel for abuse of discretion.[20] The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[21] As relevant here, indigent defendants are permitted to request the appointment of new counsel, or to proceed pro se, if they are unhappy with their current court-appointed attorney.[22]

If a defendant requests substitute counsel, the court must evaluate whether the defendant's justification for seeking new counsel is based on "good cause" to "justify a continuance

---

[20] *See United States v. Gibbs*, 190 F.3d 188, 207 n.10 (3d Cir. 1999).

[21] U.S. Const. amend. VI.

[22] *See United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982).

of the trial in order to allow new counsel to be obtained."[23] We have explained that good cause can be "a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with the attorney."[24] "[T]he district court must engage in at least some inquiry as to the reason for the defendant's dissatisfaction with his existing attorney" to determine whether the defendant has shown good cause.[25]

We recently addressed the issue of a court's failure to inquire into a motion for substitute counsel in *United States v. Diaz*.[26] There, the indigent criminal defendant wrote to the District Court five times before trial regarding issues with appointed counsel. Despite not specifically requesting new counsel in the first two communications, the District Court ordered defendant's attorney to respond to the letters. The attorney did not do so. On the third attempt, defendant stated, "I am requesting that you consider appointing me new counsel."[27] The District Court took no action. Instead, one month later, defendant's attorney filed a motion for continuance in which he represented that all issues between counsel and defendant were resolved. Counsel and defendant then appeared together at a pretrial conference, and neither raised any issues involving representation. Nevertheless,

---

[23] Id.

[24] *United States v. Goldberg*, 67 F.3d 1092, 1098 (3d Cir. 1995).

[25] *Welty*, 674 F.2d at 187; *see also Martel v. Clair*, 565 U.S. 648, 664 (2012) ("As all Circuits agree, courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer.").

[26] 951 F.3d 148 (3d Cir. 2020).

[27] *Id.* at 153.

defendant wrote to the District Court two more times before trial raising similar concerns. But, defendant did not renew his request for new counsel in either of these letters. The case proceeded to trial without further inquiry.

In finding no abuse of discretion, we noted that "the District Court may not have been as attentive to [defendant's] complaints regarding his counsel as it should have been," but that soon after defendant's request, the District Court "had good reason to believe [the attorney] was communicating with [defendant] such that [defendant's] request was withdrawn or moot."[28] We explained that the information the District Court received in the motion for continuance made it clear that the attorney was paying attention to defendant's requests, and intervention was unnecessary. Thus, *Diaz* presented "a unique circumstance," and the "District Court's inaction would . . . normally raise serious questions."[29]

Turning to the case at hand, we are yet again presented with a claim of a district court's inaction. The Government argues that because Senke did not explicitly request substitute counsel in his pretrial motion, the District Court was under no obligation to act. This places an inappropriately strict requirement on pro se defendants to know the law and articulate the exact action they desire from the court.[30] And

---

[28] *Id.* at 152, 155.

[29] *Id.* at 155.

[30] *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) (explaining that our "policy of liberally construing *pro se* submissions is driven by the understanding that . . . [there] is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent

13

*Diaz* suggests that district courts should at least attempt to inquire further when made aware of a possible breakdown in communication.[31] Moreover, we have said that a communication breakdown could be sufficient for a good cause finding, and we have not made such a finding contingent on the filing of a clearly articulated motion.[32] Here, the District Court was made aware of a potential breakdown in communication.

Similar to the defendant in *Diaz*, Senke submitted a communication to the District Court in which he complained about his attorney, but he stopped short of asking for substitute counsel. The communication raised serious issues, including that Comerford was not preparing for trial and had called the evidence "to[o] disgusting" to review with Senke.[33] This alone gives us pause as to the District Court's inaction. But then at a pretrial conference, Comerford brought the strained relationship to the District Court's attention. Referencing Senke's pretrial motion, Comerford explained that the conflict stemmed from his refusal to file additional pretrial motions, and Senke's insistence that he do so. Of course, an attorney is not required to take every action that his client desires.[34] But

---

forfeiture of important rights because of their lack of legal training") (internal quotation marks and citations omitted).

[31] *Diaz*, 951 F.3d at 155 ("It is clear that the Court was aware of [defendant's] concerns, and it took some action to remedy the situation when it ordered [the attorney] to file a response to [defendant's] [first] letter.").

[32] *See Welty*, 674 F.2d at 188.

[33] App. 316.

[34] *See Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("The adversary process could not function effectively if every

14

this conversation, coupled with Senke's letter raising alarming concerns, should have indicated to the District Court that further inquiry was necessary.

In *Diaz*, we cautioned that "[a]lthough the requisite inquiry may consider a variety of sources and need not include a one-on-one colloquy with the defendant," we must also consider "the importance of allowing the defendant, as well as counsel, the opportunity to be heard on the matter."[35] We further warned that "if a district court fails to make '*any* on-the-record inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney,' it abuses its discretion."[36]

Here, the District Court neither allowed Senke the opportunity to clarify his communication, nor made any searching inquiry on the record that would satisfy us that it had deduced the reasons for Senke's dissatisfaction. Indeed, at the pretrial conference, which Senke was not a part of, the only colloquy regarding the meaning of Senke's communication occurred between defense counsel and the prosecutor. Heeding our warnings in *Diaz*, we are not convinced that based

---

tactical decision required client approval."); *see also Gonzalez v. United States*, 553 U.S. 242, 248-50 (2008).

[35] 951 F.3d at 154; *see United States v. Hodge*, 870 F.3d 184, 202 (3d Cir. 2017) ("[B]y only gathering information from counsel whom a defendant wishes to reject, but not the defendant himself, a trial court creates some risk of overlooking some latent, legitimate reason for substitution that is not articulable by his counsel.").

[36] *Diaz*, 951 F.3d at 154 (citing *McMahon v. Fulcomer*, 821 F.2d 934, 944 (3d Cir. 1987)).

on perfunctory exchanges at one pretrial conference where (i) the defendant was not present, and (ii) the District Court conducted no further inquiry, the District Court had "good reason to believe" that Comerford and Senke were communicating again before trial.[37]  Moreover, Senke reiterated his concerns regarding Comerford's lack of communication in his post-trial motions.  He also raises the issue before us, where there is a question of whether Comerford reviewed the PSR with Senke.  It seems then, these communication issues were not resolved, and we see no reason for the District Court to believe that they were before trial.  For these reasons, we are persuaded that the District Court's failure

---

[37] *Diaz*, 951 F.3d at 155; *see also McMahon*, 821 F.2d at 942-44 (holding that trial court erred by denying defendant's request for a continuance to obtain new counsel based "upon *counsel's* communication that he knew of no reasonable basis for his discharge . . . without engaging in any on-the-record inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney.").  It is worth noting that the District Court's comment that Senke "doesn't have much of a chance of losing" Comerford because he was "the second or third guy on this deal," is irrelevant to our analysis.  App. 338.  We have been clear that the obligation to inquire is in no way dependent on the number of requests a defendant has made, nor the number of attorneys that have represented a defendant.  *See Diaz*, 951 F.3d at 154-55; *McMahon*, 821 F.2d at 942 ("Even when the trial judge suspects that the defendant's contentions are disingenuous, and motives impure, a thorough and searching inquiry is required.").  And these comments do not suggest that the District Court reviewed and considered Senke's motion.

16

to inquire into Senke's pretrial motion was an abuse of discretion.

Finding error, we must evaluate its impact and proper remedy.[38] This analysis is contingent upon the right implicated

---

[38] Our dissenting colleague points to dicta in *Martel* suggesting that the Court of Appeals in that case had "ordered the wrong remedy even assuming the District Court had abused its discretion in denying [the habeas petitioner's] substitution motion without inquiry." *Martel*, 565 U.S. at 666 n.4; *see also* dissent at page 15. The Supreme Court there noted that had the Court of Appeals correctly determined that the district court abused its discretion in declining to evaluate the petitioner's request for new counsel, it should have "remand[ed] to the District Court to decide whether substitution was appropriate at the time of [petitioner's] letter. Unless that court determined that counsel should have been changed, the Court of Appeals had no basis for vacating the denial of [petitioner's] habeas petition." *Martel*, 565 U.S. at 666 n.4. Our dissenting colleague argues we should remand here for the same purpose, and that *Martel* "rejected the functional equivalent of a prejudice standard, too." Dissent at page 15 n.66. But this reads too much into the Supreme Court's suggestion. The language our colleague cites for the rejection pertains to the separate question of what a capital habeas petitioner must show to substitute counsel under 18 U.S.C. § 3599. *See Martel*, 565 U.S. at 656-63. The Supreme Court held the same "interests of justice" standard on motions to substitute counsel in non-capital criminal cases should also apply to capital habeas petitioners seeking new counsel. *Id.* at 660, 663. The Court did not address whether a defendant who had a substitution motion wrongfully denied would have to demonstrate

by Senke's claim.  Senke asserts that the failure to inquire into a defendant's dissatisfaction with appointed counsel is structural error—meaning reversal is required regardless of whether the defendant can show prejudice or harm.  But he is confusing his right to *any* counsel with his right to *effective* counsel.  These rights are distinct, and so, too, is our analysis of each.

The cases Senke and the dissent rely on for the assertion of structural error involved defendants that sought substitution of counsel on the eve of trial, had their request denied, and therefore were forced to choose between going to trial pro se or with counsel they were dissatisfied with.[39]  Where a defendant then elects to proceed pro se, he or she must knowingly and voluntarily waive the right to any counsel.[40]  This requires the district court to conduct an analytically distinct inquiry "guaranteeing that the defendant understands what he is giving up, that he is 'made aware of the dangers and disadvantages of self-representation.'"[41]  In these cases, it was the failure to conduct this separate inquiry that required

_____

prejudice.  But its suggestion that remand would be necessary even if the Court of Appeals concluded that the district court abused its discretion by not inquiring into the basis for the substitution motion suggests that the failure to inquire into dissatisfaction with counsel, without more, is not structural error.

[39]*Welty*, 674 F.2d at 187; *Goldberg*, 67 F.3d at 1096; *McMahon*, 821 F.2d at 936-37.

[40] *Welty*, 674 F.2d at 190.

[41] *Id.* (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)).

reversal, not an inadequate inquiry into the reasons for a defendant's dissatisfaction with counsel.[42]

To be certain, if Senke were asserting that his right to retained counsel of choice was violated, such deprivation would be structural error.[43] The same would be true if he were

---

[42] *Welty*, 674 F.2d at 194 ("Because this record does not disclose that Welty effectively waived his constitutional right to counsel, we are obliged to reverse his conviction."); *Goldberg*, 67 F.3d at 1099, 1102 (finding "no abuse of discretion in the denial of the continuance" to seek retained counsel, but vacating conviction because "the district court failed to inform Goldberg of the risks of self-representation in accordance with *Faretta* and *Welty*."); *McMahon*, 821 F.2d at 946 ("[W]e hold that the trial court failed properly to determine whether McMahon's waiver of his sixth amendment right of counsel was knowing and intelligent."). *McMahon* made this point particularly clearly, holding that it would have reversed the petitioner's conviction in that case "even if [the court] were to have found the trial judge's denial of petitioner's continuance motion [to seek new retained counsel] proper." 821 F.2d at 944. The dissent also misreads the rationale of these decisions. They did not require reversal because "the defendants were forced to choose between representing themselves and counsel that they had lost faith in." Dissent at page 12. This Court reversed because they had not effectively waived their right to counsel.

[43] *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-52 (2006) (affirming Eighth Circuit's reversal of conviction where defendant was deprived of his right to paid counsel of his choosing); *see also United States v. Rankin*, 779 F.2d 956, 960-61 (3d Cir. 1986) (vacating and remanding for new trial where

---

19

asserting that he was denied the right of self-representation.[44] This is because a choice-of-counsel violation or a self-representation violation occurs at the moment the defendant's choice is wrongfully denied.[45] But the Supreme Court has been careful to distinguish these rights from the right to effective assistance of counsel.

The right to effective counsel is derived from the guarantee of a fair trial in the Due Process Clause, and the elements of a fair trial are defined through the Sixth Amendment.[46] The Sixth Amendment recognizes the right to effective assistance "because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results."[47] Accordingly, "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."[48] A violation of the right to effective counsel requires a showing

---

district court refused to continue trial date, forcing defendant to proceed to trial with appointed counsel when his retained counsel of choice was unavailable).

[44] *See McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984).

[45] *See Gonzalez-Lopez*, 548 U.S. at 150.

[46] *Id.* at 146 (citing *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984)).

[47] *Strickland*, 466 U.S. at 685; *see Gonzalez-Lopez*, 548 U.S. at 147 (explaining that "[t]he earliest case generally cited for the proposition that 'the right to counsel is the right to the effective assistance of counsel,' . . . was based on the Due Process Clause rather than on the Sixth Amendment[.]" (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970))).

[48] *Strickland*, 466 U.S. at 685.

of prejudice, because "[c]ounsel cannot be ineffective unless his mistakes have harmed the defense[.]"[49]

By contrast, the right to counsel—including, *inter alia*, the right to counsel of choice and the right to self-representation—"has never been derived from the Sixth Amendment's purpose of ensuring a fair trial."[50] Rather, such rights are "the root meaning of the constitutional guarantee."[51] The deprivation of these rights qualifies as structural error because, in part, the consequences "'are necessarily unquantifiable and indeterminate.'"[52] The Supreme Court has expressed a reluctance to expand the narrow category of rights that qualify for per se reversal.[53]

Here, Senke's claim does not fall into one of the established categories of structural error. He has not asserted

---

[49] *Gonzalez-Lopez*, 548 U.S. at 147 (internal quotation marks omitted).

[50] *Id.* at 147-48; *see Faretta*, 422 U.S. at 819-21.

[51] *Gonzalez-Lopez*, 548 U.S. at 147-48.

[52] *Gonzalez-Lopez*, 548 U.S. at 150 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993)).

[53] *See generally*, *Mickens v. Taylor*, 535 U.S. 162, 173-74 (2002) (limiting automatic reversal rule established in *Holloway v. Arkansas*, 435 U.S. 475 (1978) and holding that to demonstrate a Sixth Amendment violation where trial court failed to inquire into potential conflict of interest, defendant had to establish conflict adversely affected counsel's performance); *see id.* at 166 (collecting cases "where assistance of counsel has been denied entirely or during a critical stage of the proceeding[,]" sparing the defendant from the need to show effect on the outcome of trial).

that he was deprived of his right to counsel of choice. Indeed, he cannot, because the right to choose one's own counsel does not extend to defendants who require appointed counsel.[54] And he has not claimed that he was somehow deprived of his right to knowingly and intelligently represent himself.[55] Nor has Senke claimed that Comerford had any conflict of interest,[56] or that he was so "embroiled in irreconcilable conflict" with Comerford that he was deprived "of the effective assistance of any counsel whatsoever," as some of our sister circuits have examined.[57] Despite his earlier misgivings with counsel, Senke proceeded to trial with the assistance of Comerford. He therefore cannot also claim that he was denied the right to any counsel at all.

---

[54] *See Gonzalez-Lopez*, 548 U.S. at 151; *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989).

[55] *Cf. Faretta*, 422 U.S. at 835.

[56] *Goldberg*, 67 F.3d at 1098.

[57] *Compare United States v. Smith*, 640 F.3d 580, 590 (4th Cir. 2011) (quoting *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970)), *with United States v. Wallace*, 753 F.3d 671, 675 (7th Cir. 2014) ("If communication with the defendant's counsel broke down as a result of neglect or ineptitude by counsel, the defendant may have a claim of ineffective assistance of counsel, but to prove that he would have to present evidence.") *and United States v. Smoot*, 918 F.3d 163, 169 (D.C. Cir. 2019) ("A defendant challenging the denial of a motion to substitute counsel must show that he was not 'afforded effective representation' in order to show that denial of the motion was prejudicial." (quoting *United States v. Graham*, 91 F.3d 213, 221 (D.C. Cir. 1996))).

Instead, it is possible to examine the record for identifiable mistakes and assess whether those mistakes affected the outcome of his trial.[58] Senke's claim is therefore more appropriately viewed as one for ineffectiveness, which must be reviewed for prejudice. The wrinkle, though, is that Senke has not attempted to show prejudice in this direct appeal. And the District Court has not yet evaluated the matter. This is why, generally, we do not review claims of ineffectiveness on direct appeal and prefer that they be raised through a habeas corpus proceeding.[59] Accordingly, although the District Court failed to inquire into Senke's complaints about counsel, we conclude that we cannot grant Senke relief on this claim as it is presently framed. We note that our disposition is without prejudice to Senke's ability to bring a claim under 28 U.S.C. § 2255.[60]

---

[58] *See Gonzalez-Lopez*, 548 U.S. at 150.

[59] *See United States v. DeRewal*, 10 F.3d 100, 103-04 (3d Cir. 1993).

[60] There is some support for our holding from our sister circuits. For example, the First Circuit in *United States v. Mota-Santana*, 391 F.3d 42, 45-46 (1st Cir. 2004), rejected a defendant's contention that there was a conflict of interest requiring reversal where counsel was ordered to respond to his client's expressions of dissatisfaction. It explained that

> [w]ere disagreements between attorney and client to be treated in the same manner as [conflict of interest cases]—with resulting possible *per se* reversal without the necessity of proving prejudice—the nature of appeals in criminal cases would be dramatically altered. The odds are that many an unsuccessful

*Id.* at 46.  Likewise supporting a showing of prejudice, the Second Circuit observed in *United States v. Doe #1*, 272 F.3d 116, 123 (2d Cir. 2001), that "if the reasons proffered [in a substitution motion] are insubstantial and the defendant receives competent representation from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless error."  *Cf. United States v. Morrissey*, 461 F.2d 666, 670 (2d Cir. 1972) (indicating a reluctance to reverse even where defendant raised serious issues with counsel, and ultimately affirming because defendant's contentions were incorrect or subsequently cured, but noting that "[w]ithout more, [the trial judge's] failure to inquire, in our view, would constitute error sufficient for reversal of the judgment of conviction.").  Similar to the holding in *United States v. Doe #1*, the Eighth Circuit in *United States v. Jones*, 795 F.3d 791, 797 (8th Cir. 2015), found no abuse of discretion where the magistrate judge denied defendant's substitution motion without inquiry because the motion contained all of the information the court needed to make a ruling.  In so finding, the Eighth Circuit explained that even if a trial court abuses its discretion, "the Sixth Amendment does not require an automatic reversal of the conviction."  *Id.* at 796 (citing *Martel*, 565 U.S. at 666 n.4 (reviewing renewed motion for substitution of appointed counsel in federal habeas corpus proceeding, and noting that the Ninth Circuit ordered the wrong remedy even if the district court abused its discretion because "[t]he way to cure that error would have been to remand to the District Court to decide whether substitution was appropriate at the time of [defendant]'s letter.")).  Even the Ninth Circuit, though

As to Senke's post-trial motions for new counsel, we conclude that the District Court did not abuse its discretion by not appointing substitute counsel for sentencing purposes. Senke stated multiple times in his post-trial motions that he was requesting "appealant [sic]" counsel. The District Court reasonably understood this to be a request for appellate counsel.[61] Accordingly, it was not error for it to conclude that any action on its part was moot.

## B. The Failure to Verify

Senke next argues that the District Court failed to comply with Federal Rule of Criminal Procedure 32(i)(1)(A), which provides that "[a]t sentencing, the court: (A) must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the

---

previously supporting automatic reversal, *see Craven*, 424 F.2d at 1170, has reinforced that unless there is a constructive denial of counsel, defendant must show prejudice. *Schell v. Witek*, 218 F.3d 1017, 1026-28 (9th Cir. 2000) (en banc) (reversing, in part, district court's denial of defendant's petition for a writ of habeas corpus and remanding for evidentiary hearing to determine the nature and extent of the conflict between defendant and his attorney and whether that conflict deprived defendant of adequate representation); *see United States v. Musa*, 220 F.3d 1096, 1102-03 (9th Cir. 2000) (vacating sentence and remanding for a hearing on the nature of the conflict between defendant and his attorney, and instructing that "[i]f, after a thorough inquiry, the district court finds no breakdown in communication that prevented an adequate defense, it may reinstate the sentence.").

[61] *See* App. 641; 650.

report."[62]   Because this issue was unpreserved, Senke must show plain error.[63]   Under the plain error standard, we may vacate and remand Senke's sentence only if we find (1) an error was committed; (2) the error was plain; and (3) the error affected Senke's substantial rights.[64]

In interpreting Rule 32(i)(1)(A), we have declined to create "an absolute requirement that the court personally ask the defendant if he has had the opportunity to read the report and discuss it with counsel."[65]   Instead, we have "allowed for a more functional fulfillment of the rule, requiring only that the district court 'somehow determine that the defendant has had this opportunity,'" "before imposing sentence."[66]

Here, the District Court did not verbally ask Senke if he read and discussed the PSR with his attorneys.  The question, then, is whether the District Court could have independently determined that information before sentencing.

The Government asserts that "it is clear from the record that both [Comerford] and Senke had an opportunity to read the PSR as both filed specific objections."[67]   That is true. Comerford submitted a sentencing memorandum to the District

---

[62] Fed. R. Crim. P. 32(i)(1)(A).

[63] *United States v. Olano*, 507 U.S. 725, 734 (1993).

[64] *Id.* at 732-34.

[65] *United States v. Mays*, 798 F.2d 78, 80 (3d Cir. 1986).

[66] *United States v. Stevens*, 223 F.3d 239, 241 (3d Cir. 2000) (quoting *Mays*, 798 F.2d at 80).  At the time of *Stevens*, the Rule 32(i)(1)(A) requirement was codified as Rule 32(c)(3)(A).

[67] Gov't Br. 33.

Court, wherein he successfully argued that the PSR improperly enhanced Senke's offense level. Separately, Senke submitted his own objections, which were addressed in an addendum to the PSR.

However, nowhere in the sentencing memorandum does it state that Comerford and Senke discussed the PSR together. Moreover, Comerford submitted his objection to the probation officer before receiving Senke's objections. At sentencing, Comerford only mentioned the objection made in the sentencing memorandum, and did not reference any of Senke's. While that may have been because Senke's objections lacked merit, we cannot conclude that Comerford's silence indicates he reviewed the objections or discussed them with Senke. Nor does the District Court's recitation of Senke's objections and the one made in the sentencing memorandum indicate that it determined Senke had the opportunity to discuss the PSR with counsel. Instead, these facts only confirm that Senke and Comerford read the PSR, but they suggest nothing about a meeting of the minds.

Finding plain error, we turn to the issue of Senke's substantial rights. For substantial rights to have been affected, "the error must have been prejudicial," in that it "affected the outcome of the district court proceedings."[68]

Senke asserts that if the District Court had asked if he discussed the PSR with counsel, he could have challenged the recommendation of certain special conditions of supervised release, and the recommendation of the $10,000 special assessment fee under the JVTA. These arguments are

---

[68] *Olano*, 507 U.S. at 734.

unconvincing. Neither of these matters could have affected Senke's criminal history category, nor the applicable Guidelines range.[69] Moreover, Senke was sentenced to the statutory mandatory minimum; thus "there is no reasonable likelihood that the sentence would have been different," had the District Court verified a PSR discussion took place.[70] Accordingly, Senke's Rule 32(i)(1)(A) claim must fail.[71]

## C.     The Special Conditions of Supervised Release

Next, Senke takes issue with several special conditions of supervised release imposed by the District Court. Because this challenge was unpreserved, Senke must show plain error.[72]

Each special condition must be reasonably related in a "tangible way," to the defendant's crimes or something in his history, and it must involve no greater deprivation of liberty than is reasonably necessary to deter future crime, protect the public, or rehabilitate the defendant.[73] "This is not an especially high standard."[74] But the sentencing court must set forth factual findings to justify the special conditions.[75] If the

---

[69] *See Stevens*, 223 F.3d at 244.

[70] Id.

[71] We stress the importance and relative ease of satisfying a Rule 32(i)(1)(A) verification on the record at sentencing. A very simple colloquy between defendants and district courts would remove all doubt.

[72] *See United States v. Pruden*, 398 F.3d 241, 248 (3d Cir. 2005).

[73] *Id.* at 248-49 (internal quotation marks and citation omitted).

[74] *Id.* at 249.

[75] *United States v. Voelker*, 489 F.3d 139, 144 (3d Cir. 2007).

court fails to do so, we may nevertheless affirm "if we can ascertain any viable basis" for the condition.[76]

> i. *Conditions on Computer and Internet Usage*

Senke argues that the conditions relating to his internet and computer usage are contradictory and more restrictive than necessary. Specifically, he notes that Condition 11 instructs that he "must not possess and/or use computers . . . or other electronic communications or data storage devices or media."[77] Yet Conditions 12-15 require him to obtain permission from his probation officer to use the internet, have monitoring software installed on any computer he uses, and submit to searches of his computers, electronic communications, and data storage devices.[78]

The Government concedes that Conditions 11-15 are contradictory and require further clarification by the District Court. We agree. These conditions are indistinguishable from the conditions we struck down in *United States v. Holena*.[79] There, we carefully laid out the considerations a sentencing court must give when balancing public protection against broad, untailored restrictions on a defendant's liberty.[80] We

---

[76] *Id.* at 144 (internal quotation marks and citation omitted).

[77] App. 13.

[78] App. 13-14.

[79] 906 F.3d 288 (3d Cir. 2018).

[80] *Id.* at 291-94 ("To gauge whether an internet or computer restriction is more restrictive than necessary, we consider three factors: the restriction's length, its coverage, and 'the

29

noted that "internet bans are 'draconian,'" particularly in a modern society, where one can hardly complete menial tasks without using a computer or the internet.[81]  As such, the goal of restricting internet and computer use for defendants like Senke must be to keep them from preying on children.  For the reasons explained in *Holena*, there is no such tailoring here. Conditions 11-15, as currently written, prevent Senke from participating in all sorts of activities, while doing nothing to further public safety.[82]

On remand, the District Court must "make findings to support any restrictions it chooses to impose on [Senke's] internet and computer use."[83]  Undoubtedly, there is a strong need to protect the public, and the District Court may still find it appropriate to limit Senke's internet and computer use.[84]  But any limitations must be supported by facts, tailored to Senke's conduct, and "aim to deter future crimes, protect the public, or rehabilitate [Senke]."[85]

### ii. Conditions on Contact with Minors

---

defendant's underlying conduct.'"  *Id.* at 292 (quoting *United States v. Heckman*, 592 F.3d 400, 405 (3d Cir. 2010))).

[81] *Id.* at 292 (quoting *Heckman*, 592 F.3d at 408).

[82] *See id.* at 294-95 (noting that a complete ban on computer and internet use raises First Amendment concerns because it restricts an array of activity, without making the public safer).

[83] *Id.* at 291.

[84] *Id.* at 293 ("We recognize that the need to protect the public is strongest in cases like this, when the defendant used the internet to try to molest children.").

[85] Id.

Senke also contends that Conditions 6 and 7, regulating his contact with minors, are contradictory. Condition 7 bans Senke from going to or remaining at any place where children "are likely to be."[86] Yet Condition 6 requires him to obtain permission from the probation officer in order to have direct contact with children.[87] He also argues that Condition 7 is overbroad and unnecessary in light of Condition 6, when the record shows that he was not seeking out children and had no prior sexual interest in children.

The Government responds that Condition 6 prohibits "direct" contact with minors without prior permission from a probation officer, while Condition 7 prohibits intentional travel to and/or remaining at places where minors frequent and are likely to congregate.

We agree with the Government's reasoning; Conditions 6 and 7 are not contradictory or overbroad. As the Government explains, Condition 6 requires Senke to receive permission from a probation officer before having *direct* contact with a minor, regardless of location. Condition 7 prevents him from traveling to places where minors are likely to be, even if he does not intend to have direct contact with any minors. For additional clarity, Condition 7 provides examples on the types of places it encompasses. These conditions are appropriately tailored to Senke's crime, and are not so contradictory or overbroad that Senke "cannot tell what they forbid."[88]

Senke also complains that Conditions 7 and 8 are

---

[86] App. 13.

[87] Id.

[88] *Holena*, 906 F.3d at 291.

31

unconstitutionally vague. He argues that reasonable people could disagree about whether children are "likely to be" at a variety of places, and there is no guidance as to how he or his probation officer should determine his "primary purpose" for going to a particular location.[89]

We previously upheld an arguably stricter condition that restricted any unsupervised contact with minors in a case where the defendant was convicted solely of possessing child pornography.[90] In doing so, we determined that the prohibition against unsupervised contact was not unconstitutionally vague because it did not foreclose accidental contact.[91] Similarly, the Second and Fifth Circuits have routinely upheld special conditions that banned defendants from areas where children "frequent" or "congregate."[92] The same is true of provisions

---

[89] App. 13.

[90] *United States v. Loy*, 237 F.3d 251, 254 (3d Cir. 2001).

[91] *Id.* at 269 ("At this point, it is well established that associational conditions do not extend to casual or chance meetings.").

[92] *See United States v. Fields*, 777 F.3d 799, 806 (5th Cir. 2015) (upholding a condition that prohibited defendant from going to places "where a minor or minors are known to frequent" and defining those "places" to include schools and playgrounds, but not locations such as grocery stores, places of worship, transportation hubs, and most stores); *United States v. MacMillen*, 544 F.3d 71, 73, 75-76 (2d Cir. 2008) (upholding a condition prohibiting the defendant from being in "any" area where children are "likely" to congregate because "[t]he condition challenged here provides [defendant] with adequate notice of what conduct is prohibited—namely, frequenting places where children are likely to congregate."); *United States*

that include anti-loitering language similar to that of Condition 8.[93]

Here, neither Conditions 7 nor 8 bar accidental contact that could occur during ordinary activities in public places. These conditions are tangibly related to Senke's conviction, where he attempted to entice a minor to meet him in a public place for the purposes of sexual contact. Moreover, their wording is not so vague that "men of common intelligence must necessarily guess at [their] meaning and differ as to [their] application."[94]

### iii. *Conditions Relating to Testing*

*v. Johnson*, 446 F.3d 272, 280-81 (2d Cir. 2006) (upholding a provision of supervised release that prohibited the defendant from being in "any" area where children are "likely" to congregate); *United States v. Paul*, 274 F.3d 155, 165-67 n.13 (5th Cir. 2001) (denying a vagueness challenge to a condition instructing defendant to avoid "places, establishments, and areas frequented by minors," finding that this direction may be reasonably interpreted and enforced).

[93] *See United States v. Oliphant*, 456 F. App'x 456, 458-59 (5th Cir. 2012) (per curiam) (upholding against vagueness challenge condition stating that defendant "shall not have access to or loiter near school grounds"); *United States v. Burroughs*, 613 F.3d 233, 246 n.3 (D.C. Cir. 2010) (upholding against vagueness challenge condition barring defendant from "loiter[ing] in any place where children congregate").

[94] *United States v. Maloney*, 513 F.3d 350, 357 (3d Cir. 2008).

Senke contends that Conditions 1 and 10 delegate excessive authority to his probation officer by requiring him to take an unlimited number of drug and polygraph tests.

District courts may not delegate to probation officers the power to "decide the nature or extent" of supervised release conditions.[95] But we have held that "probation officers must be allowed some discretion in dealing with their charges," as "courts cannot be expected to map out every detail of a defendant's supervised release."[96] In the context of mental health intervention, we determined that if a defendant is required to participate in intervention "only if directed to do so by his probation officer," then this is an impermissible delegation of judicial authority.[97]

Here, the probation officer was instructed by the District Court to subject Senke to drug and polygraph testing. While the probation officer may decide the time, place and frequency of such testing, the testing is not optional. Senke is required to participate in order to comply with the District Court's conditions. Because the District Court has merely delegated to the probation officer the details with respect to "selection and schedule" of the testing, such delegation is proper.[98]

### D.    The JVTA Special Assessment Fee

---

[95] *Pruden*, 398 F.3d at 250.

[96] *Id.*

[97] *Id.* at 250-51 (quoting *United States v. Peterson*, 248 F.3d 79, 85 (2d Cir. 2001)).

[98] *Id.*

Lastly, Senke argues that the District Court erred by imposing a $10,000 special assessment under the JVTA.[99] He contends that because the JVTA was enacted on May 29, 2015, and he was charged with offenses committed between September 2014 and February 2015, this assessment violates the Ex Post Facto Clause. The Government concedes that the fee imposition was plain error. We agree and will vacate the fee.

## IV.    CONCLUSION

For the foregoing reasons, we will vacate the District Court's judgment as to its imposition of special Conditions 11-15 regarding Senke's internet and computer use and a special assessment fee under the JVTA and remand for further proceedings. We will otherwise affirm the District Court's judgment as to Senke's conviction and sentence.

---

[99] 18 U.S.C. § 3014.

McKEE, concurring in part and dissenting in part.

The Majority correctly concludes that "the district court's failure to address Senke's complaints regarding his counsel was an abuse of discretion under our precedent in *United States v. Diaz*."[1] However, my colleagues incorrectly conclude that relief is conditioned upon Senke demonstrating that he was prejudiced by his attorney's conduct. That conclusion arises from the Majority's belief that the Sixth Amendment right that has been abridged by the district court's abuse of discretion was Senke's right to effective assistance of counsel, rather than his right to substitute counsel.[2] The former right is, as my colleagues explain, subject to harmless error analysis and the requirement that a defendant demonstrate prejudice pursuant to *Strickland v. Washington*.[3] However, the court's failure to inquire into Senke's request for substitute counsel was an abuse of discretion that is not subject to a harmless error inquiry.[4] Rather, precedent from our court and

---

[1] Maj. Op. at 2.

[2] *Id*.

[3] 466 U.S. 668, 684–85 (1984).

[4] As I explain in Part III, *infra*, the Supreme Court has recognized an indigent defendant's right to substitute counsel where it is in the "interests of justice." *See Martel v. Clair*, 565 U.S. 648, 658 (2012). We have interpreted the interests of justice standard to require a showing of "good cause," *i.e.* that the defendant had "a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict" with the attorney. *United States v. Welty*, 674 F.2d 185, 188 (3d Cir. 1982). Where a defendant shows good cause and a district court fails to substitute counsel, the error is the functional equivalent of the denial of a defendant's right to counsel of

1

the Supreme Court require that, at the very least, we remand to the district court with instructions to determine if the conflict between Senke and his counsel was irreconcilable.[5] If it was, and it clearly may have been, there was structural error that requires a new trial.

## I.

As my colleagues recognize, the district court did not appropriately inquire to determine whether there was "a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict" between Senke and his appointed trial attorney.[6] Such an inquiry is vital because "[t]he right to counsel is among those 'constitutional rights (which are) so basic to a fair trial that their infraction can never be treated as harmless error.'"[7] Where the relationship between an indigent

---

choice. *See id.*; *see also United States v. Smith*, 640 F.3d 580, 590 (4th Cir. 2011) ("Once a district court has determined that [a] defendant and his counsel's communication has so deteriorated as to prevent the mounting of an adequate defense . . . an appointment of substitute counsel is part and parcel of a defendant's Sixth Amendment right."). As the Supreme Court has explained, a denial of this right is not subject to a prejudice analysis. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) ("Where the right to be assisted by counsel of one's choice is wrongly denied . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.").

[5] *See Martel*, 565 U.S. at 666 n.4.

[6] *United States v. Diaz*, 951 F.3d 148, 154 (3d Cir. 2020).

[7] *Welty*, 674 F.2d at 194 n.6 (citing *Chapman v. California*, 386 U.S. 18, 23 & n.8).

defendant and the attorney has broken down and the defendant demonstrates good cause for substitution of counsel, new counsel must be appointed.[8]

Here, there was only a rather perfunctory exchange between the court and counsel which revealed the court's disinclination to regard Senke's request with the seriousness the law requires. As the Majority recounts, at a pretrial conference, Senke's attorney told the court that Senke was not happy with him because Senke wanted him to "fil[e] more motions."[9] My colleagues quite correctly reject the government's attempt to argue that Senke never requested substitute counsel. As my colleagues explain, Senke was a *pro se* litigant and his pretrial letter to the court "raised serious issues, including that Comerford was not preparing for trial and had called the evidence 'to[o] disgusting' to review with Senke."[10] My colleagues cite to *Higgs v. Attorney General*,[11] where we explained that our "policy of liberally construing *pro se* submissions is driven by the understanding that . . . [there] is an obligation on the part of the court to make reasonable

---

[8] *Id.* at 188. *See also United States v. Velazquez*, 855 F.3d 1021, 1037 (9th Cir. 2017) (concluding that where "the district court abused its discretion by denying Velazquez's requests to substitute counsel without conducting an adequate inquiry[,] [t]he result was a constructive denial of counsel that require[d] [the court] to vacate Velazquez's guilty plea" and remand for further proceedings with new counsel).

[9] Maj. Op. at 6 (citing App. 338).
[10] *Id.* at 14 (citing App. 316).
[11] 655 F.3d 333 (3d Cir. 2011).

allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training."[12] I agree.

I also agree with my colleagues' conclusion that Senke's communication to the court "should have indicated to the district court that further inquiry was necessary."[13] Rather than engaging in the required inquiry, the court summarily dismissed any suggestion that Senke's dissatisfaction with counsel was tantamount to a request for a new attorney. The court responded by telling counsel that Senke didn't "have much of a chance of losing" Comerford, because he was "the second or third guy on this deal."[14] Ironically, the only real inquiry came not from the court but from the prosecutor who inquired, "[h]e's not trying to fire you, is he?" Defense counsel replied, "[n]ot that I know of."[15] But, of course, Senke was also complaining about defense counsel's lack of communication with him.[16]

---

[12] Maj. Op. at 13, n.75 (quoting *Higgs*, 655 F.3d at 339).

[13] *Id*. at 14.

[14] App. 338. I disagree with my colleagues' conclusion that this remark by the court "is irrelevant to our analysis." Maj. Op. at 15, n.84. Although I realize that my colleagues may have simply been referring to the fact that the court's statement did not rise to the level of an adequate inquiry, I nevertheless think the comment is relevant as it establishes the absence of such an inquiry and the court's predisposition to refrain from undertaking that inquiry.

[15] App. 339.

[16] Indeed, Senke points to the following exchange at the pretrial conference to argue that Comerford was actively working against Senke's interests by suggesting that the court issue an

I therefore agree with the Majority's holding that the trial court abused its discretion in not exploring the nature of the conflict between Senke and defense counsel. I must nevertheless dissent from the Majority Opinion because my colleagues hold that Senke is arguing ineffective assistance of counsel and that his claim is therefore subject to a harmless error analysis under *Strickland.*

## II.

Senke is clearly arguing that the court denied him his right to counsel not because of any alleged ineffective

---

order precluding Comerford from filing any more motions on Senke's behalf. Comerford stated:

> I'm just – I just want you to – like, how do you want me to cover the record? Do you want me to file a motion to let – leave of court to file more motions and you deny it? I don't know how you want me to handle it.
>
> * * *
>
> So I will try to protect the record, and I will file . . . some type of
> documentation with the court for leave to file additional motions, and then
> Your Honor can do whatever you need to do with it.

App. 338–39.

assistance and consequent prejudice, but because an irreconcilable conflict existed between himself and his attorney that resulted in a structural error. His brief simply cannot be fairly read any other way. It clearly cannot be read as asserting the kind of ineffectiveness claim under *Strickland* that the Majority relies upon to support harmless error review.

The relevant arguments in Senke's brief are structured as follows:

    I.    The district court violated the Sixth Amendment by failing to inquire into or rule on Mr. Senke's pretrial motion for appointment of new counsel . . .

        A. When an indigent criminal defendant moves for appointment of new counsel, the court must inquire into the reasons for his dissatisfaction with his attorney . . .

        B. The district court abused its discretion by failing to inquire into or rule on Mr. Senke's pretrial motion for appointment of new counsel.[17]

The relevant legal arguments under Senke's "Discussion" section of his brief are similarly focused and pertain only to the court's failure to inquire into Senke's request for new counsel. Senke's brief even cites to specific parts of the record where that argument was preserved. It

---

[17] Appellant's Br. at i–ii.

states: "Mr. Senke preserved the issue by filing one pretrial and three posttrial motions for appointment of new counsel."[18] Yet, the Majority concedes: "[t]o be certain, if Senke were asserting that his right to retained counsel of choice was violated, such deprivation would be structural error."[19] But that is exactly what he is asserting insofar as the claim pertains to substitute counsel. Excerpts from his brief clearly establish this.

> My colleagues state:
> [I]t is possible to examine the record for identifiable mistakes and assess whether those mistakes affected the outcome of [Senke's] trial. Senke's claim is therefore more appropriately viewed as one for ineffectiveness, which must be reviewed for prejudice. The wrinkle, though, is that Senke has not attempted to show prejudice in this direct appeal.[20]

They incorrectly conclude from Senke's briefs and from our exchange at oral argument that Senke was asserting a claim of ineffective assistance of counsel under *Strickland* rather than structural error for failing to substitute counsel.[21] A close reading of the transcript of oral argument, however, simply does not support the contention that counsel was there asserting a *Strickland* claim rather than structural error.

A *Strickland* prejudice analysis was discussed at oral argument, but only in response to questions from the panel. The exchange began when appellate counsel referred to the

---

[18] *Id*. at 2.
[19] Maj. Op. at 19.
[20] *Id*. at 23 (internal citations omitted).
[21] *Id*.

7

letter that Senke sent before trial complaining about trial counsel. Appellate counsel argued, "properly construed, this was clearly a motion for new counsel because he was saying I don't believe I can get a fair trial with this man as my attorney."[22] After a few exchanges, appellate counsel was basically instructed to argue harmless error: "So either you have to show us that this is structural, or you have to demonstrate prejudice. Your brief has not made any effort to show prejudice. Can you make a prejudice showing here today?"[23] Appellate counsel responded that he could "go through various reasons why [he] believe[d] the attorney's representation at trial wasn't competent."[24] We then interrupted counsel and asked: "the second prong [of *Strickland*] is what you're being asked about now, and . . . [w]hat, if any, prejudice resulted from that dereliction of professionalism?"[25] But counsel had not raised the specter of a dereliction of professionalism; we had. Counsel attempted to respond to our inquiry by explaining: "in a series of cases . . . which we cite in our brief, when a court-appointed attorney should be removed for cause – and we're assuming, for purposes of this question, that he should have been removed for cause – then there is a constructive denial . . . of the right to

---

[22] Transcript of Oral Argument ("Transcript") at 4.

[23] *Id*. at 8. Senke's brief made no attempt to establish prejudice precisely because he was not arguing ineffective assistance of counsel under *Strickland* but a structural error that resulted from the court's failure to appoint substitute counsel. Given that, it would have been self-defeating to then argue prejudice in his brief, as we asked him to at oral argument.

[24] *Id*. at 8.

[25] *Id*. at 9.

counsel."[26] After a brief exchange, counsel continued: "No court has ever required [a showing of prejudice] . . . in this situation. If an attorney should have been removed for cause, then it's considered prejudice, per se."[27]

> We then pressed counsel further:
> [to] clarify again. There are two ways you can win, one of them is structural or presumption. *You're pushing that now*, let's get to that in a minute. I want to give you an opportunity, if there is anything you can cite to show prejudice, this is your chance. If you don't answer this question, then we have to take the whole thing on the structural approach.[28]

After another brief exchange, counsel sought clarification: "When you say 'establish prejudice,' do you mean that there were things that this attorney did that was [sic] prejudicial to my client?"[29] We responded by again referring to *Strickland* and asking "is there anything you can cite in this record that would satisfy [the prejudice requirement of *Strickland*]?"[30] Counsel answered, "Absolutely, Your Honor," and he then went on to argue points in the record that he believed would satisfy the prejudice prong of *Strickland* just as we had invited him to.[31]

---

[26] *Id.*

[27] *Id.*

[28] *Id.* at 9–10 (emphasis added).

[29] *Id.* at 10.

[30] *Id.*

[31] *Id.* at 10, 11.

Arguments raised on appeal are defined by, and limited to, the arguments outlined in a litigant's brief. They are not defined by issues that were not briefed and raised only at oral argument. That axiom should apply with particular force where, as here, counsel's statements at argument were only an attempt to respond to questions or direction from the court. In fact, we have declined to decide issues raised by the panel during argument but not presented in the party's appellate brief.[32]

**III.**

In *Martel v. Clair*, the Supreme Court recognized a statutory right to substitute counsel where an indigent defendant shows that substitution is in the "interests of justice."[33] The Court there cited our opinion in *Welty* in discussing when the interests of justice required substitution of counsel.[34] A reviewing court can determine whether substitution is in the interests of justice by looking at "the

---

[32] *See, e.g.*, *United Artists Theatre Cir., Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 397 (3d Cir. 2003) (noting that a prior "panel did not decide [an issue] . . . because the issue was raised by the panel on its own at argument and was not briefed by the parties . . . ."); *United States v. Lennon*, 372 F.3d 535, 541 n.10 (3d Cir. 2004) ("For the same reason that we will not consider an argument minted at the reply brief stage, we will not consider an argument made by counsel for the first time at oral argument.").

[33] 565 U.S. at 658 ("'[T]he interests of justice' . . . standard derives from 18 U.S.C. § 3006A, which governs the appointment and substitution of counsel in federal non-capital litigation.").

[34] *Id.* at 663.

timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)."[35] We have interpreted this standard to require a showing of "good cause;" *i.e.* where the defendant demonstrates that there was a "conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with [the] attorney," substitution follows.[36]

In *Gonzalez-Lopez*, the Supreme Court concluded that a district court's erroneous denial of a defendant's motion to substitute counsel was "structural error" and required relief without any demonstration of prejudice.[37] Although the defendant in *Gonzalez-Lopez* was able to pay for his attorney and therefore had a right to counsel of his choice, the Court's conclusion that where substitute counsel is erroneously denied, the defendant has suffered structural error, applies with equal force here. A defendant who has been denied this right need not show prejudice to get relief; the defendant merely needs to show that good cause existed to substitute counsel and that the district court failed to do so.[38]

---

[35] *Id*. (citing *United States v. Prime,* 431 F.3d 1147, 1154 (9th Cir. 2005); *United States v. Doe,* 272 F.3d 116, 122–123 (2nd Cir. 2001); *Welty,* 674 F.2d at 188).

[36] *Welty*, 674 F.2d at 188; *accord Diaz*, 951 F.3d at 154.

[37] *Gonzalez-Lopez*, 548 U.S. at 150.

[38] *See, e.g.*, *Welty*, 674 F.2d at 188; *Velazquez*, 855 F.3d at 1034 ("A defendant need not show prejudice when the breakdown of a relationship between attorney and client from

11

In concluding otherwise, the Majority attempts to buoy its view of the essence of Senke's constitutional claim by suggesting that he has confused his claim of the denial of counsel of choice with the Sixth Amendment's guarantee of effective assistance of counsel. We are told that the latter requires competent representation and thus lends itself to an inquiry into prejudice whereas the former protects the structural integrity of the trial. However, in *Gonzalez-Lopez*, the Supreme Court rejected the same kind of hair-splitting that my colleagues engage in here. There, the Court rejected the state's argument "that the Sixth Amendment violation is not 'complete' unless the defendant can show that substitute counsel was ineffective within the meaning of *Strickland v. Washington . . . i.e.*, that substitute counsel's performance was deficient and the defendant was prejudiced by it."[39] In explaining why *Strickland* did not apply there, the Court stated:

> the Government's argument in effect reads the Sixth Amendment as a more detailed version of the Due Process Clause—and then proceeds to give no effect to the details. It is true enough that the purpose of the rights set forth in that Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair.[40]

---

irreconcilable differences results in the complete denial of counsel.").

[39] *Gonzalez-Lopez*, 548 U.S. at 144 (internal citation omitted).

[40] *Id*. at 145.

Of course, as mentioned, Senke's counsel was appointed to him and therefore he was differently situated than the defendant in *Gonzalez-Lopez*, who could afford his own counsel, but the Court's fundamental teaching, that an erroneous deprivation of counsel is structural error, is no less vibrant for a defendant with appointed counsel.[41] The Court in *Gonzalez-Lopez* was concerned with the "erroneous" "deprivation of counsel," concluding that such deprivation was structural error.[42] So too in a case where an indigent defendant shows cause – that there was a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict

[41] As the Majority notes, the Court in *Gonzalez-Lopez* stated that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them," *id.* at 151, but that statement, which was dicta, did nothing to alter the structural error holding of the case. In fact, in making that statement, the Court cited to *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989), where it concluded that "[a] defendant has no Sixth Amendment right to spend *another person's money* for services rendered by an attorney." *Id*. (emphasis added). When considering the case of an indigent defendant, the *Gonzalez-Lopez* Court's statement is best read in that context, as a statement on the practical limitations indigent defendants face when requesting substitute counsel – because the defendant cannot afford substitute counsel, the defendant will have to do with appointed counsel. I do not, however, read the Court's statement in *Gonzalez-Lopez* as doing what the Majority suggests; namely, precluding an indigent defendant from raising a claim of structural error where the defendant was erroneously denied substitute counsel.
[42] *Gonzalez-Lopez*, 548 U.S. at 146.

with the attorney – and is erroneously denied substitute counsel. That defendant has similarly been "depriv[ed] of counsel . . . erroneous[ly]" and the error in the case is structural. That indigent defendant, too, need not demonstrate prejudice to get relief.

The Majority claims that "Senke's claim does not fall into one of the established categories of structural error."[43] But as we have consistently held, if Senke can show good cause then he is entitled to substitution of counsel.[44] The erroneous deprivation of such substitute counsel is akin to the denial of a defendant's Sixth Amendment right to choice of counsel, which, unequivocally, is structural error.

The Court's reasoning in *Gonzalez-Lopez* is therefore equally applicable here: "[T]he erroneous denial of counsel bears directly on the framework within which the trial proceeds. . . . It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings."[45] Accordingly, where "the deprivation of counsel [i]s erroneous[,] [n]o additional showing of prejudice is required to make the violation 'complete.'"[46] This is true whether a defendant can pay for an attorney or not. "Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe."[47] An indigent defendant is constitutionally entitled to go to trial with

---

[43] Maj. Op. at 21.
[44] *See Welty*, 674 F.2d at 188.
[45] *Id*. at 150 (internal citations and quotations omitted).
[46] *Id*. at 146.
[47] *Id*. at 150.

an attorney with whom the defendant does not have an irreconcilable conflict.[48]

We have also previously concluded that when a defendant has been deprived of the right to substitute counsel, the error requires reversal without a prejudice inquiry. In *Welty*, we reversed and remanded where the trial court refused to appoint new counsel and where we were not convinced that the court adequately investigated the defendant's decision to proceed pro se.[49] And in *McMahon v. Fulcomer*,[50] we also reversed and remanded where the district court granted defense counsel's motion to withdraw and denied defendant's motion for a continuance, which would have allowed him time to procure substitute counsel.[51] We did not engage in a prejudice analysis following the district court's erroneous decision to deny substitute counsel in either case.

The Majority concludes that because the defendants in such cases were forced to choose between counsel with whom they were dissatisfied and with self-representation, the cases are inapposite.[52] But that distinction is without a difference. Rather, it is merely a reflection of the reality that these cases

---

[48] *See United States v. Smith*, 640 F.3d 580, 590 (4th Cir. 2011) ("[T]o compel one charged with grievous crime to undergo trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.") (citations omitted).

[49] 674 F.2d at 194.

[50] 821 F.2d 934 (3d Cir. 1987).

[51] *Id*. at 944.

[52] Maj. Op. at 17–18.

15

often arise in that posture. The fact that the defendants were forced to choose between self-representation and counsel that they had lost faith in, however, does not negate the proposition that substitute counsel must be provided when there is an adequate showing of good cause.

My colleagues conclude that these cases are not helpful because our primary concern there was different from our concern here. They claim that our concern in prior cases was whether the district court adequately ensured that the defendants' decisions to proceed pro se were knowing and voluntary.[53] The Majority notes that here, "despite his . . . misgivings," Senke did not proceed pro se, but rather decided to go to trial with Comerford.[54] While it is true that we were concerned with the district courts' failures to appropriately inquire into defendants' decisions to proceed pro se in *Welty* and *McMahon*, it does not follow that we are therefore at liberty to ignore the clear conclusion from those cases. Those cases stand for the proposition that an inquiry into prejudice is not appropriate in circumstances analogous to the circumstances here.

Moreover, in disregarding the teaching of our prior cases, my colleagues ignore the fact that an appropriate inquiry here would almost certainly have forced Senke to either waive his right to counsel and proceed pro se or proceed to trial represented by Comerford. Of course, the constitutional viability of the latter option turns on the extent to which the relationship between Senke and Comerford had deteriorated and whether any conflict was irreconcilable. Given Senke's

---

[53] *See* Maj. Op. at 17 & n.38.
[54] *Id*. at 22.

16

representation that Comerford found the discovery here "to[o] disgusting" to review, that is not at all unlikely. However, Senke's case never advanced to the point where the nature of the conflict with defense counsel was explored. That is the primary distinction between this case and our prior cases. However, it is a distinction without a difference given the district court's failure to ascertain anything further about the conflict Senke had with Comerford. Accordingly, the remedy for that abuse of discretion should be a remand to allow the district court to determine if the conflict was irreconcilable. If it was, a new trial with substitute counsel is required.

Other circuit courts of appeals agree that a showing of prejudice is not required for relief where a district court erroneously fails to substitute counsel. For example, the Court of Appeals for the Ninth Circuit recently concluded: "[w]here a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel."[55] Under these circumstances, "[a] defendant need not show prejudice."[56] Similarly, in *United States v. Jennings*,[57] the Court of Appeals for the Sixth Circuit concluded that, based on the appellate record, it was "unable to determine whether the district court discharged its responsibility of ascertaining the reasons underlying the defendant's dissatisfaction with [appointed] counsel."[58] Accordingly, the court remanded "for the purpose of allowing the district court to personally inquire from each defendant his reasons for dissatisfaction with

---

[55] *Velazquez*, 855 F.3d at 1033–34.
[56] *Id*. at 1034.
[57] 945 F.2d 129 (6th Cir. 1991).
[58] *Id*. at 132.

17

counsel."[59] The panel instructed the district court that if, on remand, it found "good cause" to substitute counsel, "each [defendant] would be entitled to new appointed counsel for re-trial," without a showing that the appointed attorneys who represented the defendants at trial were ineffective.[60] We should do the same here.

## IV.

We have consistently held that "the district court must engage in at least some inquiry as to the reason for the defendant's dissatisfaction with his existing attorney."[61] "[E]ven when the trial judge strongly suspects that the defendant's requests are disingenuous and designed solely to manipulate the judicial process and to delay the trial" or where the record reveals "overwhelming evidence of [the defendant's] guilt," a court cannot give short shrift to this inquiry.[62]

---

[59] *Id.*

[60] *Id.* Additionally, in *United States v. Collado-Rivera*, the Sixth Circuit concluded that the "district court abused its discretion by summarily denying [a] post-trial motion for new counsel." 759 F. App'x 455, 467 (6th Cir. 2019). It held "[t]he appropriate remedy is to remand for a hearing on the issue whether, at the time of sentencing, there was good cause for substitution of counsel." *Id.* On remand, "[i]f the district court determine[d] that [the defendant] had good cause for substitution of counsel," the court held that the defendant "should be re-sentenced" with new counsel. *Id.*

[61] *Diaz*, 951 F.3d at 154.

[62] *Welty*, 674 F.2d at 186, 187.

We reaffirmed in *Diaz* that the inquiry is designed to determine whether good cause, *i.e.* "a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict,"[63] exists between a defendant and his or her attorney. If it does, the defendant is entitled to new counsel. And where a court fails to perform such an inquiry, remand is required.[64]

In *Martel*, the Supreme Court determined that where a district court abuses its discretion in failing to inquire into a defendant's complaints about counsel, (as my colleagues realize the district court did here), the appropriate remedy is to remand to the district court for a hearing to determine whether substitution was warranted. The Court put it plainly: If a district court "abuse[s] its discretion in denying [a defendant's] substitution motion without inquiry[,] [t]he way to cure that error [is] to remand to the district court to decide whether substitution was appropriate at the time of [the defendant's] letter" requesting substitution.[65] The focus of the inquiry is *not* on finding any deficiencies in the lawyer's performance after the defendant files the substitution motion, but rather on the nature of the defendant's relationship with the appointed lawyer when the substitution motion is filed.[66] In describing

---

[63] *Diaz*, 951 F.3d at 154.

[64] *See Martel*, 565 U.S. at 666 n.4.

[65] *Id*.

[66] The *Martel* Court can be read to have rejected the functional equivalent of a prejudice standard, too. The government contended that remand was inappropriate because "even if the attorney-client relationship ha[d] broken down," Clair's attorney "ha[d] the required qualifications and [wa]s 'act[ing] as an advocate.'" *Id*. at 661. But the Court rejected that argument. It concluded that the appropriateness of substitution

19

the appropriate standard, the Court cited to our decision in *Welty*, and to Second and Ninth Circuits' decisions in *United States v. Prime*,[67] *United States v. Doe*,[68] none of which discussed – much less required – a showing of prejudice on the substitution issue.[69]

In *Prime*, a panel of the Court of Appeals for the Ninth Circuit described the appropriate three-part inquiry to review a district court's denial of a motion to substitute counsel: "1) the timeliness of the motion; 2) the adequacy of the district court's inquiry into the defendant's complaint; and 3) whether the asserted conflict was so great as to result in a complete breakdown in communication and a consequent inability to present a defense."[70] Similarly, in *Doe*, a panel of the Court of Appeals for the Second Circuit described that the appropriate inquiry focused on: "(1) whether [the] defendant made a timely motion requesting new counsel; (2) whether the trial court

---

did not turn on whether the attorney had been "acting as an advocate." *Id*. at 663.

[67] 431 F.3d 1147, 1154 (9th Cir. 2005).

[68] 272 F.3d 116, 122–123 (2d Cir. 2001).

[69] *Martel*, 565 U.S. at 663. Of course, we recognize that *Martel* was a capital case and the question addressed by the Court was whether, when evaluating motions to substitute counsel in capital cases, the same "interests of justice" standard applied there as it did in non-capital cases. *Id*. at 658. But because the Court concluded that the same standard applies to both capital and non-capital cases alike, *id*., the analysis in *Martel* – including the Court's directive to remand to the district court for a hearing if the court abuses its discretion in denying substitution without an appropriate inquiry – applies with full force here.

[70] 431 F.3d at 1155.

adequately inquired into the matter; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense."[71] Whether the defendant was prejudiced by counsel's performance is simply not part of the inquiry.

Additionally, in *Diaz*, we considered whether the district court abused its discretion in failing to inquire into Diaz's dissatisfaction with counsel. We never inquired into whether counsel's actions after Diaz requested new counsel prejudiced Diaz. Rather, as in *Martel*, the inquiry was focused on Diaz's relationship with his attorney when he filed the substitution motion. We only concluded that the court did not abuse its discretion because "the District Court had good reason to believe [Diaz's attorney] was communicating with Diaz such that Diaz's request was withdrawn or moot."[72] If, as the Majority concludes, a showing of prejudice were required, we would not have looked at Diaz's relationship with his counsel, but rather evaluated Kalinowski's performance as Diaz's attorney. But we did not do so there, and we should not do so here.

In sum, because the district court abused its discretion when it failed to appropriately inquire into Senke's dissatisfaction with counsel and request for substitute counsel, we must remand to the district court for a hearing to determine whether good cause existed to substitute counsel. If the district court determines that good cause existed, then it must vacate Senke's conviction and retry Senke with new appointed counsel.

---

[71] 272 F.3d at 122 (internal quotations omitted).
[72] *Diaz*, 951 F.3d at 155.

21

## V.

Finally, although I completely agree with, and join, Section III.C. of the Majority Opinion explaining why certain conditions of supervised release are overbroad, I want to take this opportunity to address the fact that some courts in our Circuit continue to impose what can only be described as knee-jerk and overly broad restrictions on internet and computer use, despite our repeated admonitions to the contrary. I suspect that the persistence of such sentencing practices, despite our consistent reversals and remands reflects a lack of understanding of technology rather than stubborn resistance to our decisions. But whatever the reason, the kind of irrational, draconian, and unconstitutional restrictions on internet and computer usage that are demonstrated by some of the terms of Senke's supervised release must stop.

We all recognize that some defendants are capable of using computers and the internet to victimize others and that reasonable restrictions must therefore be placed on such use in appropriate cases. However, as we have so often tried to explain, such restrictions must be applied in a thoughtful and tailored way based upon the facts of a given case and care must be taken not to allow the justification for imposing some restrictions to morph into an excuse for imposing broad restrictions that impose on First Amendment liberties or restrain a defendant's freedom more than necessary.

As the Majority correctly recognizes, computer and "internet bans are draconian, particularly in a modern society, where one can hardly complete menial tasks without using a

computer or the internet."[73] Thus, "blanket internet restrictions will rarely be tailored enough to pass constitutional muster."[74] The district court's ban on possessing and using "computers . . . [and] other electronic communications" devices would cover all computers, cell phones, and a broad range of other devices, from "gaming devices to fitness trackers to smart watches."[75] On its face, this restriction is too broad. It would "prevent [Senke] from doing everyday tasks, like preparing a résumé or calling a friend for a ride," along with commonplace "tasks that have migrated to the internet, like shopping, or searching for jobs or housing," even though "none of these activities puts the public at risk."[76]

Almost 15 years ago, in *Voelker*, we noted that all new cars then being produced contained at least one computer and that the order banning access to computers or the internet would have prevented the defendant from driving a car, using an ATM or a telephone, to name but a few ramifications of an untailored ban on computers and the internet.[77] For better or worse, the presence of computers and the internet in everyday life has grown exponentially since then. A subsequent online article about auto shows was titled: "How cars have become

---

[73] Maj. Op at 30 (internal quotations omitted). *See also United States v. Voelker,* 489 F.3d 139, 145 (3d Cir. 2007) ("The ubiquitous presence of the [I]nternet and the all-encompassing nature of the information it contains are too obvious to require extensive citation or discussion.").

[74] *Holena*, 906 F.3d at 295.

[75] *Id*. at 294.

[76] *Id.* at 292, 294.

[77] 489 F.3d at 148 n.8.

rolling computers."[78] And that was four years ago. The caption of a relatively more recent article in the Wall Street Journal speaks volumes about the ubiquitous nature of computers: "Your Smartphone Is the Best Computer You Own."[79] And yet, the kind of reflexive restrictions that were imposed on internet and computer usage here continues.

Although we have said it so often that it should not need repeating, I separately emphasize what my colleagues clearly and unambiguously hold in the Majority Opinion. Such bans must be tailored and focused on the particular evil that a court is concerned with. In addition, they must not be worded so broadly as to give "the probation office no guidance on the sorts of internet use that it should approve."[80]

For courts that continue to insist on ignoring the law of this Circuit and reflexively imposing unconstitutional and irrational restrictions that sweep too broadly and infringe First Amendment liberties, I can only respond by quoting our dearly

---

[78] Steve Mertl, *How cars have become rolling computers*, The Globe and Mail (Mar. 5, 2016), https://www.theglobeandmail.com/globe-drive/how-cars-have-become-rolling-computers/article29008154/#:~:text=The%20average%20car%20today%20can,networked%20but%20sometimes%20operating%20independently.

[79] David Pierce, *Your Smartphone Is the Best Computer You Own*, The Wall St. Journal (May 23, 2018), https://www.wsj.com/articles/your-phone-is-the-best-computer-you-ownso-use-it-more-1527084001.

[80] *Holena*, 906 F.3d at 293.

---

24

departed colleague, Judge Joseph Weis. In *Gregory v. Chehi*,[81] in explaining the origins of the doctrine of res judicata, Judge Weis recounted a statement by a confederate general who, after twice refusing a soldier's request for a furlough, scribbled the following on the back of the soldier's third request: "I told you twicest Godamnit know."[82]

I can only hope that this is the last time we will have to explain (yet again) the practical and constitutional demand that courts carefully and individually tailor restrictions on internet and computer use to prevent an associated evil. However, if history is any teacher, Judge Weis' ever so appropriate exhortation will probably be called to mind at some point yet again.

---

[81] 843 F.2d 111 (3d Cir. 1988).
[82] *Id.* at 112.